PEOPLE v BEAN

Docket No. 105414. Argued March 4, 1998 (Calendar No. 11). Decided June 16, 1998.

Kimani Bean was convicted by a jury in the Detroit Recorder's Court, Prentis Edwards, J., of first-degree murder, assault with intent to murder, and possession of a firearm during the commission of a felony. During trial, a hearing was held to determine whether due diligence had been exercised in attempting to locate two key prosecution witnesses, who had not been produced. The court ruled that it had, and allowed Mr. Pryor's preliminary examination testimony to be read to the jury. The Court of Appeals, CORRIGAN, P.J., and HOEKSTRA and P. E. DEEGAN, JJ., affirmed in an unpublished opinion per curiam (Docket No. 167029). The defendant appeals.

In an opinion by Chief Justice MALLETT, joined by Justices BRICKLEY, CAVANAGH, WEAVER, KELLY, and TAYLOR, the Supreme Court *held*:

The prosecution failed to exercise due diligence in its attempts to produce a key witness.

1. Use of preliminary examination testimony as substantive evidence at trial does not violate the constitutional right to confront accusers if the witness is unavailable and the prosecution has exercised both due diligence to produce the absent witness and the testimony bears satisfactory indicia of reliability. Whether a witness is unavailable depends on whether the prosecution made a diligent good-faith effort to locate the witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it.

2. In this case, while the police made some attempts to locate the witness, they did not exercise due diligence. It was error to allow his transcribed testimony from the preliminary examination to be read to the jury as substantive evidence.

Reversed and remanded.

Justice BOYLE, concurring in part and dissenting in part, stated that due diligence is not the statutory standard regarding production of an endorsed witness. MCL 767.40a; MSA 28.980(1) provides

that witnesses may be added or deleted by leave of the trial court for good cause shown or by stipulation of the parties. As recognized in *People v Burwick*, 450 Mich 281 (1995), the appropriate inquiry under the statute is whether the trial court abused its discretion in excusing the production of a witness. In this case, the trial court did not abuse its discretion in proceeding without witness Anderson.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Valerie M. Steer*, Assistant Prosecuting Attorney, for the people.

*Elizabeth L. Jacobs* for the defendant-appellant.

MALLETT, C.J. Following a jury trial, the defendant was convicted of first-degree murder, assault with intent to murder, and possession of a firearm during the commission of a felony. The Court of Appeals affirmed. We reverse the judgments of the Court of Appeals and the trial court because the prosecution failed to exercise due diligence in its attempts to produce a key witness.

I

The case arises from events that occurred in the early morning hours of January 4, 1992. Donavan Cargill was the passenger in a car driven by his cousin, Eric Martin. Shots were fired, and Mr. Martin was killed. Mr. Cargill survived, and was one of two persons who later testified at the preliminary examination of defendant Kimani Bean.

Mr. Cargill testified at the preliminary examination that, as their car came to a stop at a traffic light, he noticed the defendant standing by a nearby building, on the passenger side of their car. The defendant was

illuminated by the headlights of the cars, and was carrying a "MAC 12" automatic weapon. As Mr. Martin's vehicle came to a stop, the defendant and another person began shooting. Mr. Martin was killed as a result of three shots to the head. Mr. Cargill was struck thirteen times, and spent the next two months in the hospital.

The second witness at the preliminary examination was Martez Pryor. He testified that he was a pedestrian who witnessed the shooting. With him was a friend named Demetrius Anderson. Mr. Pryor saw the defendant in a car that was driven by someone named "Meatman" (who was later identified as Frank A. Caldwell).[1] Mr. Pryor testified that he saw the defendant jump out of the driver's side, and Mr. Caldwell jump out of the passenger's side of the car, and begin to shoot at the car that contained Mr. Cargill.

On cross-examination, Mr. Pryor acknowledged that he had not approached the police with his story until about ten months after the shooting.[2] He did so only after a friend named Antonio Jones[3] was shot in an incident that, Mr. Pryor believed, involved Mr. Caldwell. However, he denied that the reason for his decision to testify was to get even with Mr. Caldwell's friend, defendant Kimani Bean.[4]

---

[1] Charges were brought against Mr. Caldwell, but the prosecutor's inability to produce witnesses eventually caused the charges to be dismissed.

[2] This prosecution did not get under way until Mr. Pryor made his report—apparently there were no suspects until then.

[3] Mr. Jones was later described as Mr. Pryor's cousin.

[4] Defense counsel began to ask Mr. Pryor whether he believed that the defendant also was involved in the shooting of Mr. Jones, but counsel was sidetracked by an objection. Though the objection was overruled, counsel moved on to a related question concerning the defendant's friendship with Mr. Caldwell, and did not get an answer to her question whether Mr. Pryor

On this testimony, the defendant was bound over on charges of first-degree (premeditated) murder of Mr. Martin, assault with intent to murder Mr. Cargill, and possession of a firearm during one or both of those felonies. MCL 750.316(1)(a), 750.83, 750.227b; MSA 28.548(1)(a), 28.278, 28.424(2).

Before trial, the defendant filed a notice of an alibi defense. Presumably, the prosecution filed a witness list[5] that included the names of Mr. Pryor and Mr. Anderson, since they were res gestae witnesses and the record confirms that the court issued subpoenas for them.

During the trial, the assistant prosecutor asked for a hearing on whether due diligence had been exercised in the attempts to locate Mr. Pryor and Mr. Anderson, neither of whom had been produced for trial. The purpose of the hearing was to gain permission to use Mr. Pryor's preliminary examination testimony at trial. The prosecutor also sought to foreclose an instruction that Mr. Anderson's testimony could be inferred as having been unfavorable to the prosecution.[6]

After taking testimony from three Detroit police witnesses, the trial court ruled that due diligence had been demonstrated. Accordingly, the court allowed the preliminary examination testimony of Mr. Pryor to

---

thought the defendant had also been involved in the shooting of Mr. Jones.

[5] Such a list is required by MCL 767.40a(3); MSA 28.980(1)(3), but a copy is not in the court file.

[6] The assistant prosecutor was mindful of CJI2d 5.12, which reads:

_____ is a missing witness whose appearance was the responsibility of the prosecution. You may infer that this witness's testimony would have been unfavorable to the prosecution's case.

be read to the jury. Also in keeping with its ruling regarding due diligence, the court did not instruct the jury with regard to an inference to be drawn from the nonproduction of Mr. Anderson.

At trial, the prosecution expanded its proofs, but the key witnesses remained Mr. Cargill and Mr. Pryor (who did not appear, but whose examination testimony was read to the jury). The defendant did not testify, but he presented an alibi defense. One alibi witness testified in some detail regarding a trip he and the defendant had taken to Chicago several days before the offense occurred. He said they attended a concert at the Rosemont Horizon, and then stayed in Chicago several days, not returning until after the shooting occurred. Another alibi witness (a sergeant employed full time by the National Guard) testified that he had traveled separately to Chicago for other reasons, and happened to encounter the defendant at a night club in the early morning hours of January 4, 1992, just about the time this crime took place.

The jury found the defendant guilty as charged. The trial court imposed the mandatory life term for first-degree murder, a ten- to fifteen-year term for assault, and a two-year consecutive term for felony-firearm.

The defendant appealed,[7] and the Court of Appeals affirmed.[8] We granted leave, limiting the issue to "whether the trial court committed reversible error in

---

[7] While the appeal was pending, the defendant persuaded the Court of Appeals to remand the case to the trial court, so that the defendant could move for a new trial on the ground that he had been denied the effective assistance of counsel. Unpublished order of the Court of Appeals, dated May 27, 1994 (Docket No. 167029). The trial court conducted an evidentiary hearing, but denied the motion for a new trial.

[8] Unpublished opinion per curiam, issued January 9, 1996 (Docket No. 167029).

finding that plaintiff exercised due diligence in attempting to locate witnesses Pryor and Anderson."[9]

II

The Sixth Amendment of the United States Constitution, and § 20 of article 1 of the Michigan Constitution of 1963, grant an accused the right "to be confronted with the witnesses against him."[10] As this Court reiterated in *People v Dye*, 431 Mich 58, 64; 427 NW2d 501 (1988):

> [T]he purpose of the Confrontation Clause is to provide for a face-to-face confrontation between a defendant and his accusers at trial. This confrontation is an important right of the defendant because it enables the trier of fact to judge the witnesses' demeanors. . . . Demeanor evidence is important.

In this case, however, the prosecution was unable to produce Mr. Pryor at trial, and sought instead to introduce his transcribed testimony from the preliminary examination.

In separate opinions, we unanimously agreed in *Dye* that the constitutional right to confront one's accusers would not be violated by the use of preliminary examination testimony as substantive evidence at trial only if the prosecution had exercised both due diligence[11] to produce the absent witnesses and that

---

[9] 456 Mich 878 (1997).

[10] The Sixth Amendment applies to the states through the Fourteenth Amendment. *Pointer v Texas*, 380 US 400; 85 S Ct 1065; 13 L Ed 2d 923 (1965).

[11] This Court has, in the context of a witness' prior testimony and the Confrontation Clause, interchangeably used the terms "due diligence" and "good faith" when addressing the prosecution's burden to produce witnesses before any prior testimony may be admitted. See *People v McIntosh*, 389 Mich 82, 87; 204 NW2d 135 (1973); *People v Starr*, 89 Mich

the testimony bore satisfactory indicia of reliability.[12] *Dye* at 64-67, 89, 98-99.

In support of the conclusion that due diligence must be shown, a majority of this Court in *Dye* also relied on the statute governing the use of preliminary examination testimony at trial:

> Testimony taken at an examination, preliminary hearing, or at a former trial of the case, or taken by deposition at the instance of the defendant, may be used by the prosecution whenever the witness giving such testimony can not, for any reason, be produced at the trial, or whenever the witness has, since giving such testimony, become insane or otherwise mentally incapacitated to testify. [MCL 768.26; MSA 28.1049.]

The constitutional principle identified in *Dye* is also reflected in the Michigan Rules of Evidence. The prosecution may present at trial the transcribed testimony of a witness at the preliminary examination, MRE 804(b)(1), if the witness is unavailable in the sense explained in MRE 804(a)(5):

> "Unavailability as a witness" includes situations in which the declarant—

---

App 342, 345; 280 NW2d 519 (1979). The "good faith" language stems from the United States Supreme Court's holding in *Barber v Page*, 390 US 719, 725; 88 S Ct 1318; 20 L Ed 2d 255 (1968). In that case, the Court held that the state authorities failed to make a good-faith effort to secure an endorsed res gestae witness at trial before admitting the transcript of the witness' preliminary hearing testimony. Since that decision, the courts of this state have adopted the "good faith" standard, and in some instances have referred to it as a "due diligence" standard. We specifically note that while the terminology is different, any difference is merely a matter of semantics and may be used properly in either form when analyzing this constitutional issue.

[12] Given the conclusion we reach with regard to due diligence, we need not address the second step, whether the examination testimony of Mr. Pryor bore "satisfactory indicia of reliability."

\*   \*   \*

is absent from the hearing and proponent of a statement
has been unable to procure the declarant's attend-
ance . . . by process or other reasonable means, *and in a
criminal case, due diligence is shown.* [Emphasis added.]

MRE 804 and *Dye* thus provide that the introduc-
tion of Mr. Pryor's preliminary examination testimony
as substantive evidence was permissible only if the
prosecution showed due diligence in its attempt to
produce Mr. Pryor. Accordingly, it is necessary to
examine closely the attempts that were made to
locate him.

III

A

The test for whether a witness is "unavailable" as
envisioned by MRE 804(a)(5) is that the prosecution
must have made a diligent good-faith effort in its
attempt to locate a witness for trial. The test is one of
reasonableness and depends on the facts and circum-
stances of each case, i.e., whether diligent good-faith
efforts were made to procure the testimony, not
whether more stringent efforts would have produced
it. *Barber v Page,* 390 US 719, 724-725; 88 S Ct 1318;
20 L Ed 2d 255 (1968); *Dye* at 67, 83. The trial court's
determination will not be disturbed on appeal unless
a clear abuse of discretion is shown. *Dye* at 83, 93
(ARCHER, J., concurring); *People v McIntosh,* 389 Mich
82, 87; 204 NW2d 135 (1973); *People v Starr,* 89 Mich
App 342, 345; 280 NW2d 519 (1979). We hold that the
record in the instant case indicates that the prosecu-
tion failed to exercise a diligent good-faith effort to

produce Mr. Pryor and the trial court abused its discretion in holding otherwise.[13]

B

As indicated, the trial court conducted a midtrial hearing regarding the efforts of the police to locate Mr. Pryor. The police witnesses were Sergeant Robert Gerds, Donald Stawiasz, and Richard Ivy.

Sgt. Gerds testified that, when Mr. Pryor spoke to the police in November 1992, he gave the police his name, social security number and birth date. He also provided the name, address, and phone number of his grandmother, with whom he was living. In addition, the police obtained an address and phone number for Mr. Pryor's mother (but not her name). Mr. Pryor gave no place of employment.

Sgt. Gerds' later efforts to contact Mr. Pryor were limited to placing unsuccessful telephone calls. He called Mr. Pryor's mother, and left a message on April 29, 1993.[14] He called the phone number again on May 10, 1993 (the first day of the defendant's trial), and received no answer. Sgt. Gerds said that the witness' phone was disconnected—presumably he meant the phone of the grandmother, with whom Mr. Pryor was living.

---

[13] Mr. Anderson did not testify at the preliminary examination, and no accusation of his was used against the defendant at trial (the court inquired about his nonproduction only to determine whether to give CJI2d 5.12) so that the defendant's constitutional right to confront Mr. Anderson was violated. Furthermore, the defendant has not argued that the prosecution's failure to locate Mr. Anderson was harmful to his defense. We therefore hold that the issue is abandoned because the appellant did not brief it. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Hence, we need not address the situation involving Mr. Anderson any further.

[14] This was the day before Mr. Caldwell's scheduled preliminary examination.

Donald Stawiasz, at the time of these events, was an investigator with the Detroit Police Department. On April 28, 1993 (twelve days before trial), he went looking for Mr. Pryor. The address given for him was an abandoned house, but Mr. Stawiasz had been told to try a house across the street. He did, and was told that Mr. Pryor's mother had moved to the Washington, D.C., area. He was further told that he should ask at another house, next door.

There, he met a Carolyn Brown, who was a relative of the Pryors. Ms. Brown supplied the name of Mr. Pryor's mother and confirmed that she had moved a week earlier to the D.C. area. Ms. Brown thought Mr. Pryor had gone with his mother. The move was prompted by a government job of some sort, but Ms. Brown knew neither the agency that employed Ms. Pryor nor in what city the Pryors lived. Mr. Stawiasz asked Ms. Brown if she knew of any local girlfriends or other contacts for Mr. Pryor, but she did not. He left his business card with Ms. Brown, but she did not contact him thereafter. Mr. Stawiasz' efforts were limited to what he did on April 28.

Richard Ivy, at the time of these events, was also an investigator with the Detroit Police Department. He assented when asked whether he was "the officer in charge of the investigation of the death of Eric Martin." He said that, when he went to get Mr. Pryor for the defendant's preliminary examination, Mr. Pryor was standing on the sidewalk in front of the address the police had for him. But when he went back to get Mr. Pryor for Mr. Caldwell's examination, the house was boarded up.

Like Mr. Stawiasz, Mr. Ivy also tried the house across the street from Mr. Pryor's known address. He

checked for two days, without success. When he returned from a short vacation, he learned from Mr. Stawiasz that Mr. Pryor and his mother had apparently moved to the Washington, D.C., area. Mr. Ivy had checked the Wayne County jail and the Oakland County jail, looking for the missing witnesses, but he ceased looking locally for Mr. Pryor after he was told of the move to Washington, D.C.

Mr. Ivy stated that he did receive a telephone call from a woman who asked to speak with Mr. Stawiasz. When he told the caller that Mr. Stawiasz was not available, she left the message, "Tell him that I couldn't find Mr. Pryor . . . ." Realizing that this message related to the present case, Mr. Ivy asked the caller to identify herself, but she responded, "No, I don't want to leave that information. I don't know where they're at." After taking that call, Mr. Ivy went back once more to the boarded-up house that had been Mr. Pryor's address and to the house across the street, but he did not find Mr. Pryor.

In questions posed to these witnesses during cross-examination, defense counsel was able to highlight many of the steps that they did not take in their efforts to locate these witnesses. For instance, although the police tried to telephone Mr. Pryor's grandmother, they never went to her address after learning that her phone was disconnected. Neither did they inquire with regard to *her* whereabouts, after learning that Mr. Pryor and his mother had moved. The police had a telephone number in Detroit for Mr. Pryor's mother, but never sought the assistance of the telephone company in matching the number to an address; neither did they ask the phone company for access to information provided by Mr. Pryor's mother

or grandmother at the time they obtained telephone service. No contacts of any kind were attempted with police departments or other agencies in the Washington, D.C., area. The police never checked with the Postal Service to see whether change-of-address forms had been filed. The police did not check with the Michigan Department of Corrections to see whether Mr. Pryor was incarcerated there, and the police did not contact the Department of Social Services (Family Independence Agency) to learn whether there was a current address for receiving public assistance benefits.[15]

After receiving these proofs, the trial court ruled that the police had exercised due diligence in attempting to locate Mr. Pryor.

The next day, Mr. Ivy testified briefly concerning an additional attempt that had been made to locate Mr. Pryor. He testified that he asked some officers who were familiar with Mr. Pryor to look for him during their evening patrol. They went to the addresses that had already been checked, with the same results—Mr. Pryor's house was boarded up, and persons in Mr. Pryor's neighborhood told the officers that he and his mother had moved to Washington, D.C.

Defense counsel then asked the trial court to reconsider its earlier ruling. However, the court adhered to its conclusion that the police had exercised due diligence.

---

[15] The materials at hand do not indicate that any of these persons were receiving public assistance.

IV

This is not a case in which the police did nothing in their attempt to locate Mr. Pryor. Neither, however, did they exercise due diligence. The police phoned his grandmother, were told that her phone was disconnected, and then ceased all efforts to contact her. At no time did the police contact any Detroit or Washington agency that might have information regarding the whereabouts in Washington of Mr. Pryor's mother.[16] The police took no steps to track down her Detroit-area home or other local sources of information about her. The police simply returned several times to Mr. Pryor's boarded-up, empty house, and to the houses across the street where they were told of the move to Washington, D.C.—sources that had already proven themselves not to be helpful.

In examining the efforts made to locate Mr. Pryor, who was believed to be out of state, one may usefully compare the steps taken in *Dye*. That case involved three missing witnesses, each of whom was known to have left the state. As the opinions of this Court recount, the prosecution was in contact with authorities in Iowa, California, and Tennessee, where the witnesses were thought to be. Significant effort was expended to locate the witnesses in those foreign jurisdictions. Further, there was a wide variety of local efforts, including checks of jails, hospitals, and morgues, and contact with utility companies and government agencies. 431 Mich 67-73, 85, 99-103.

---

[16] No effort was made to invoke the uniform act to secure attendance of witnesses from without the state. MCL 767.91 *et seq.*; MSA 28.1023(191) *et seq.*

The efforts in the present case to locate Mr. Pryor were less extensive than those described in *Dye*. The authorities in the present case took no steps whatsoever to locate Mr. Pryor or his mother in the area to which they had evidently moved. This Court having found the efforts in *Dye* insufficient, we cannot escape the conclusion that the steps taken in the present case did not constitute due diligence. Hence, it was error to allow Mr. Pryor's transcribed testimony from the preliminary examination to be read to the jury as substantive evidence at the defendant's trial.

This error was not harmless. The cross-examination of Mr. Pryor at the preliminary examination was brief, and concerned only the issue of bias. Counsel did not explore his ability to observe the disputed events. At the preliminary examination, Mr. Pryor acknowledged a link between the shooting of Mr. Jones (his friend or cousin) and his decision (ten months after the event) to report the present crime. In this context, the term "harmless" cannot be applied to the denial of the defendant's constitutional right to confront Mr. Pryor at trial, or the jury's lack of opportunity to observe Mr. Pryor's demeanor. This, when coupled with the fact that Mr. Pryor was a key witness in the prosecution's case against the defendant, simply cannot be deemed harmless. We concur in Justice Marshall's statement in *Barber* at 725, "[t]he right of confrontation may not be dispensed with so lightly."

For these reasons, we reverse the judgments of the Court of Appeals and the trial court, and remand this case for a new trial.

BRICKLEY, CAVANAGH, WEAVER, KELLY, and TAYLOR, JJ., concurred with MALLETT, C.J.

BOYLE, J. (*concurring in part and dissenting in part*). I concur with the majority's analysis regarding witness Pryor and its result. However, I write separately to address the claimed error regarding the non-appearance of witness Anderson. I would hold that "due diligence" is not the statutory standard, and that there was no abuse of discretion in proceeding without him.

In *People v Burwick*, 450 Mich 281; 537 NW2d 813 (1995), all seven members of this Court recognized that in enacting MCL 767.40a; MSA 28.980(1) the Legislature eliminated the court-created requirement, unique "in the country if not the world,"[1] that the prosecuting attorney use "due diligence" to produce all res gestae witnesses. *Id.* at 287, 308. While the context of the case was the defendant's claim that the prosecutor violated the statute by failing to exercise "due diligence" to earlier discover a witness who was endorsed during trial, the majority and the dissent both recognized that the amendment of the statute eliminated due diligence as a standard and provided that witnesses may be added or deleted upon leave of the court and for good cause shown or by stipulation of the parties. Justice LEVIN's dissent, joined by Justices CAVANAGH and MALLETT, advocated adoption of the five-part standard for good cause of *People v Travis*, 443 Mich 668, 680-683; 505 NW2d 563 (1993), which would require some minimal level of diligence by the prosecutor. *Burwick, supra* at 309. However, the dissenters agreed that in adopting the good-cause standard, the Legislature did away with the "due dili-

---

[1] Senate Analysis, SB 119 (1986 PA 46), March 26, 1986, p 1.

gence" requirement. *Id.* at 308. As Justice LEVIN observed:

> Using the majority's metaphor, the fat lady has already sung and we have no thought of bringing her back for an encore. [*Id.*]

While it is true that *Burwick* involved only the issue whether due diligence or good cause was the standard applicable to the discovery and alleged late endorsement of a witness rather than, as in this case, an alleged due diligence obligation to produce an endorsed witness, the statute makes no distinction between these situations. Rather, it provides that the list of witnesses that will be called may be amended as follows:

> The prosecuting attorney may *add or delete* from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties. [MCL 767.40a(4); MSA 28.980(1)(4) (emphasis added).]

It follows, and I would hold, that the "lady" is not off stage waiting to resume her due diligence role under the amended statute. The Legislature has eliminated her part in this morality play. *People v Pearson*, 404 Mich 698; 273 NW2d 856 (1979), mandating post-conviction evidentiary hearings regarding whether the prosecutor had exercised "due diligence" under the former statute, has been legislatively overruled.

As recognized by the entire Court in *Burwick*, the appropriate inquiry under the amended statute is whether the trial court abused its discretion in excus-

ing production of the witness.[2] Applying that inquiry, under either the majority approach or that of the dissent in *Burwick* there was no error. Under either approach, prejudice must be shown. *Id.* at 294. In contrast with his position regarding Pryor's absence, defendant made only a pro forma objection to Anderson's failure to appear. No claim was made that defendant's case was adversely affected by Anderson's absence, nor did counsel request a continuance so that additional efforts could be made to locate him.[3] Under the good-cause standard, unanimously endorsed in *Burwick*, the trial judge had the discretion to fashion a remedy to mitigate any potential unfairness from the failure to produce Anderson. However, with respect to Anderson, no unfairness or prejudice was alleged, and no remedy was requested.

The purpose of the statutory amendment was precisely to preclude use of allegations of lack of a statutory obligation of due diligence as a predicate for reversal on appeal. Failure to address the due diligence issue regarding Anderson despite our prior holding suggests lack of commitment to *Burwick* and will perpetuate confusion regarding a constantly recurring issue in trials and appeals of criminal cases. In my view, given these considerations, the Court has an obligation to the jurisprudence to reaffirm that the Legislature intended to eliminate use of due diligence as an appellate balloon and repose the question of the calling of witnesses to the discretion of the trial court, a decision that creates a reciprocal responsibil-

---

[2] The prosecutor did not formally move to strike the witness list as the statute contemplates. However, the court's ruling effectuated that result.

[3] There is no suggestion of the prosecutor's bad faith. *Burwick* at 308-309 (LEVIN, J., dissenting).

ity on the objecting party to establish a record basis
for a claim of prejudicial error. I would hold that the
trial court did not abuse its discretion in excusing
witness Anderson, and that to the extent that opin-
ions from the Court of Appeals have resurrected "due
diligence" as a statutory obligation, they are in error.