# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SAMUEL DREALL CASTON,

        Defendant-Appellant.

UNPUBLISHED
November 29, 2016

No. 327623
Oakland Circuit Court
LC No. 2014-252958-FH

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions of felonious assault, MCL 750.82, domestic violence, MCL 750.812, and possession of marijuana, second offense, MCL 333.7403(2)(d); MCL 333.7413(2). Defendant was sentenced, as a fourth habitual offender, MCL 769.12, to 2 to 15 years' imprisonment for the felonious assault conviction, 163 days' jail for the possession of marijuana conviction, and 93 days' jail for the domestic violence conviction. For the reasons set forth in this opinion, we affirm the convictions and sentences of defendant.

## I. BACKGROUND

This appeal arises from an incident which occurred between defendant and his then girlfriend, LaShawna Hubbard, at an apartment complex in Oak Park, Michigan. At 9:00 p.m. that evening, a resident of the apartment complex heard an altercation between a man and a woman outside of her apartment, prompting the resident to telephone the police. When Oak Park Public Safety officer Anthony Carignan first arrived at the apartment complex he heard Hubbard screaming, "[h]e just assaulted me." Hubbard was seen running from a silver Mercedes, and as the vehicle attempted to drive out of the parking lot of the apartment building, Officer Carignan positioned his police vehicle at a slant so the Mercedes could not leave the parking lot. When ordered by Officer Carignan to keep his hands on the steering wheel of the Mercedes, defendant screamed out, "[m]y hands are right here mother f****** n****."[1] Describing defendant as "belligerent and argumentative and yelling[,]" Officer Carignan also noted that Hubbard was

---

[1] A DVD from Officer Carignan's patrol car was admitted into evidence and played during trial.

"very upset and distraught and screaming." When Oak Park Public Safety officer Donald Hoffman arrived at the apartment complex, Hubbard told him that she and defendant had had an altercation, and according to Officer Hoffman, Hubbard gave the following recitation of the relevant events:

> She told me that [defendant] came over to [his] sister's house – his sister's house to pick her up. [Defendant] was carrying a baseball bat with him, a miniature baseball bat and she didn't want to go with him. Instead of getting assaulted she decided that she would just go with [defendant] and she told me that she got in the car, they drove around to one of the side parking lots, he hit her with an open-hand, so slapped her in the face, and then after that she told me that she – he specifically told her he was going in to the parking lot to fight her. So, they pulled into a parking lot nearby where he struck her again with a closed fist this time and then he open-hand – slapped her again actually, there was a couple times where he hit her and then he got out of the car, exited the car with the baseball in – bat in hand, and when he went up to swing at her she said that she lifted her right leg up like to kind of block the strike of the baseball bat and he hit her twice with the baseball bat in her right leg. Then [defendant] – I guess he saw the police lights and sirens and threw the baseball bat. She exited the car and he got in the car and took off and that's when she ran into the field and that's when I arrived.

Officers retrieved Hubbard's cellphone that defendant had taken from her as well as the baseball bat defendant allegedly wielded during the assault. Photographs of Hubbard and more specifically, her knee, were admitted into evidence at trial with testimony from Officer Hoffman noting that Hubbard incurred "slight bruising" to her knee but that he did not see any "obvious injuries[ ]" to her face. Officer Hoffman also recalled that Hubbard told him that she was scared for her life and that she had not wanted to go anywhere with defendant.

When Officer Carignan performed a consent search of defendant's vehicle following defendant's arrest, the search yielded two bags of suspected marijuana which subsequent testing confirmed to be marijuana. Defendant told Officer Carignan that he and Hubbard had argued, but defendant denied assaulting Hubbard. In a later statement to police, defendant reiterated that he did not assault Hubbard, denied possessing the baseball bat, but he did admit to possessing marijuana. At the close of the prosecution's case, the prosecutor requested that the trial court admit Hubbard's preliminary examination testimony pursuant to MRE 804(b)(1) and MRE 804(b)(6) as Hubbard was an unavailable witness as contemplated by MRE 804(a)(5). Following defense counsel's responding arguments, the trial court ultimately determined that Hubbard's preliminary examination testimony would be admitted into evidence.

Following the close of proofs, the trial court issued a ruling from the bench holding, in pertinent part:

> The Court has –recognizes and finds beyond a reasonable doubt that the victim and the defendant had a dating relationship or a romantic relationship. And, the Court finds from the testimony of the victim that there was a fight going on between the two of them over a phone, over suspected cheating, and that the

-2-

defendant did put the victim in fear.  She felt threatened.  Whether he actually pulled her into the car or she walked on her own, it was clear that the defendant's sister did not want them to remain.  And, it was clear from the victim's testimony that she didn't want to have a scene out front of the defendant's sister's home, so she did get into the car.  And, then the Court did find based on the testimony of the victim and the officers that the defendant did pull over into a different spot, got out of the car, and with a bat intentionally struck the victim two times in the legs.  And, yes the injury wasn't terribly serious but it could have been if the police had not been called.

\* \* \*

The Court also finds very – it weighs heavily on the Court that the victim, the testimony was, that she was slightly over five feet.  The Court takes judicial notice that the defendant is larger than five feet.  So, she was in a vulnerable position to feel threatened by the size of the defendant and knowing that he had a bat. . . .

Defendant was sentenced as indicated *supra*.  This appeal then ensued.

## II.  ANALYSIS

On appeal, defendant first argues that trial court erred in admitting the preliminary examination testimony of the complainant pursuant to MRE 804(b)(1).  He further argues that as a direct result thereof, his Sixth Amendment right to confront the witnesses against him at trial was violated.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) (citations omitted); MRE 103(a)(1). "[A]n objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003) (citation omitted).  Notably, defense counsel did not challenge at trial the admission of Hubbard's preliminary examination testimony on the grounds that the prosecution had not met the due diligence threshold of MRE 804(a)(5) in demonstrating that Hubbard was an unavailable witness.  Defense counsel also did not assert that defendant was being denied his constitutional right to confront the witnesses against him at trial.  Accordingly, these issues were not properly preserved for appellate review.

Where defendant challenges on appeal that the prosecution did not meet the threshold showing of due diligence of MRE 804(a)(5) in establishing that Hubbard was an unavailable witness, this unpreserved claim of evidentiary error is reviewed for plain error affecting a defendant's substantial rights.  *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014); *Bulmer*, 256 Mich App at 35, citing *People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999).

Turning first to the issue of whether Hubbard was an unavailable witness, MRE 804 governs situations involving unavailable witnesses, as well as providing the exception to the hearsay rule on that basis.[2] MRE 804 provides, in pertinent part, as follows:

> **(a) Definition of Unavailability**. "Unavailability as a witness" includes situations in which the declarant—
>
> * * *
>
> (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means, *and in a criminal case, due diligence is shown.*
>
> **(b) Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former Testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. [Emphasis added.]

The issue presented by defendant on appeal is whether the prosecution made a showing of due diligence in attempting to procure Hubbard's attendance at defendant's trial. MRE 804(a)(5). In evaluating whether a witness is unavailable as contemplated by MRE 804(a)(5), the guiding standard is "that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial." *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998).

> The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it. *Barber v Page*, 390 US 719, 724-725; 88 S Ct 1318; 20 L Ed 2d 255 (1968); [*People v Dye*, 431 Mich 58, 67, 83; 427 NW2d 501 (1988)]. The trial court's determination will not be disturbed on appeal unless a clear abuse of discretion is shown. *Dye* at 83, 93, (ARCHER, J., concurring); *People v McIntosh*, 389 Mich 82, 87; 204 NW2d 135 (1973); *People v Starr*, 89 Mich App 342, 345; 280 NW2d 519 (1979). [*Bean*, 457 Mich at 684.]

---

[2] Pursuant to MRE 801, " 'hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay may not be admitted at trial except as provided by the Michigan Rules of Evidence. MRE 802.

When trial first commenced, the assistant prosecutor informed the trial court that she was expecting Hubbard's attendance, however she later stated her intention to seek introduction of Hubbard's preliminary examination testimony if Hubbard did not appear. When it became obvious that Hubbard would not appear to testify at trial, the assistant prosecutor then informed the trial court that "[a] breakdown in communication" had taken place between the police, the prosecution and Hubbard. The assistant prosecutor argued that this breakdown occurred because defendant made several telephone calls to Hubbard from jail. The prosecutor also stated that she planned to introduce the preliminary examination transcript under MRE 804(b)(1) and (6). At that point in the trial, the judge asked the prosecutor to call Hubbard on the telephone and to tell Hubbard that her appearance in court was required. After the prosecutor and defense counsel presented opening statements, Detective Devon Benson informed the trial court that he was unable to reach Hubbard by way of telephone, in part, because her voicemail box was full. The trial court gave the prosecution authority for a material witness warrant if Hubbard was uncooperative, and police detectives were dispatched to Hubbard's residence and her place of employment to look for her, the efforts of which were unsuccessful. The trial court ultimately determined that the prosecution and the police exercised due diligence in attempting to secure Hubbard's attendance at trial, and allowed the admission of the preliminary examination transcript.

The record reveals that Detective Benson met with Hubbard well in advance of trial, and personally served her with a subpoena. While the prosecutor represented to the trial court that Hubbard cancelled a March 19, 2015 meeting with the prosecutor and the police, expressing misgivings about testifying at trial after defendant apologized to her, the record is also clear that the prosecutor informed Hubbard that her attendance in court to testify would be required, and that Hubbard agreed to reschedule a subsequent meeting. Detective Benson attempted to contact Hubbard several times after the March 19, 2015 meeting was cancelled, to no avail, and his attempts to receive a call back were not successful because he could not leave a voicemail on Hubbard's voicemail box that was full. Of particular note is the prosecutor's representation to the trial court, and Detective Benson's testimony, that at no point did Hubbard inform either the prosecutor or Detective Benson that she did not intend to appear at trial. The record also reflects that on the day of trial, the trial court cooperated with the prosecutor and the police to undertake every effort to secure Hubbard's presence at trial by contacting her by way of telephone, having police officers visit her place of employment and her residence, and visiting Danielle Caston's apartment, where Hubbard had been staying on the evening of the assault on November 17, 2014.

On the issue of whether the prosecution exercised due diligence in securing the testimony of Hubbard, this Court reviews the record to determine whether good-faith, diligent efforts were undertaken to secure Hubbard's testimony at trial. On appeal, defendant argues that our Supreme Court's decisions in *Dye* and *Bean* control our decision on this issue.[3]

---

[3] In his brief on appeal, defendant points to the Michigan Supreme Court's decisions in *Dye* and *Bean* as support for his position, where the Court concluded in both cases that the prosecution had not exercised due diligence in an effort to secure the presence of prosecution witnesses at

We concur with defendant that we are bound by the decisions in *Dye* and *Bean*, however, we find the basis of both decisions to be significantly different from the facts presented to the trial court in this case. Unlike in *Dye*, there is nothing in this record to suggest that the police and prosecution's efforts were belated, incomplete, or deficient. Perhaps the most important distinguishing factor between Hubbard's absence at trial and that of the witnesses in *Dye* and *Bean*, is that up until the day of trial, the prosecution and the police were both under the reasonable belief that Hubbard planned to attend and testify at this trial. While Hubbard had expressed a reluctance to testify, she had also agreed to reschedule a meeting with the police and the prosecution to discuss her testimony at defendant's upcoming trial, and as of the date of trial, Detective Benson and the prosecutor anticipated her attendance. Accordingly, it would have been premature for additional steps to be undertaken in advance of trial where Hubbard was expected to appear at trial. Indeed, the facts of this case confirm that the trial court properly concluded that the prosecution and police had acted with due diligence to secure Hubbard's attendance at trial, and her preliminary examination testimony was correctly admitted pursuant to

trial. In *Dye*, 431 Mich at 67 (opinion by Levin, J.) the Court emphasized that the determination of whether there was "a diligent, good-faith effort to produce missing witnesses" is a consideration that will depend on the specific facts of each case. The prosecution in *Dye* was aware that three witnesses had left Michigan following the defendant's mistrial, and that they had reason to go into hiding. *Id*. at 76. In *Dye*, the Michigan Supreme Court concluded that the prosecution's attempts to locate the witnesses out of state following the defendant's first trial amounted to "[s]ubsequent belated and incomplete efforts . . . ." *Id*. Specifically, the Court concluded in that case that the prosecution did not act in a timely fashion to ascertain the whereabouts of the three witnesses, and relied on local police authorities in three different states to help locate them, but was "tardy" in providing sufficient information to the local police, and did not follow up as necessary. *Id*. Notably, the prosecution had waited two months following the defendant's mistrial to attempt to locate the witnesses, even knowing that the date of the defendant's retrial was rapidly approaching. *Id*. at 67.

In *Bean*, 457 Mich at 689, 680-681, one of the prosecution witnesses was not produced at trial, and his preliminary examination testimony was admitted. The police in *Bean* had contacted the witness's grandmother, whose telephone was disconnected, but had not made further efforts to locate the grandmother, such as ascertaining the address of her home and visiting there. *Id*. at 687, 689. While becoming aware that the witness and his mother had moved to the Washington, D.C., area, the police did not contact any agencies in Detroit or Washington, D.C. in an effort to find the witness's mother in Detroit or Washington, D.C. *Id*. at 686, 687, 689. Instead, the police repeatedly returned to the witness's vacant home in Detroit. *Id*. at 689. The police did not attempt to ascertain the address of the witness's mother, did not check with the postal service to determine if a change of address had been filed, and did not check with the Michigan Department of Corrections to see if the witness was incarcerated. *Id*. at 687-688. The *Bean* Court compared the efforts made by police in that case to those of the police in *Dye*, noting that "significant effort" was made to locate the witnesses in *Dye* in foreign jurisdictions, as well as the extensive efforts that were taken locally, in Michigan, to ascertain the whereabouts of the witnesses. *Id*.

MRE 804(b)(1). Accordingly, on these facts, we cannot conclude as our Supreme Court did in *Dye* and *Bean* that the trial court abused its discretion in finding that the prosecution used due diligence to secure Hubbard's testimony.

In response to defendant's argument that his Sixth Amendment right to confront the witnesses against him was violated, the prosecution also argues that Hubbard's preliminary examination testimony was properly admitted where defendant engaged in conduct that resulted in Hubbard being unavailable for trial. The exception to the hearsay rule that the prosecution is referring to is MRE 804(b)(6), which provides, in pertinent part, as follows:

> **(b) Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (6) *Statement by Declarant Made Unavailable by Opponent*. A statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

In *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013) our Supreme Court observed that "[a] defendant can forfeit his right to exclude hearsay by his own wrongdoing." The rule that emanated from *Burns* is commonly referred to as "the forfeiture-by-wrongdoing rule[ ]" and is 'based on the maxim that 'no one should be permitted to take advantage of his wrong.'" *Id*. at 111 (footnote omitted), quoting *Giles v California*, 554 US 353, 359; 128 S Ct 2678; 171 L Ed 2d 488 (2008).

> The forfeiture doctrine not only provides a basis for an exception to the rule against hearsay; it is also an exception to a defendant's constitutional confrontation right. Insofar as it applies to the Sixth Amendment, however, the forfeiture doctrine requires that the defendant must have specifically intended that his wrongdoing would render the witness unavailable to testify.
>
> * * *
>
> To admit evidence under MRE 804(b)(6), the prosecution must show by a preponderance of the evidence that: (1) the defendant engaged in or encouraged wrongdoing; (2) the wrongdoing was intended to procure the declarant's unavailability; and (3) the wrongdoing did procure the unavailability. [*Burns*, 494 Mich at 111, 115 (footnotes and citation omitted).]

The *Burns* Court cited with approval this Court's holding in *People v Jones*, 270 Mich App 208, 217; 714 NW2d 362 (2006), that for MRE 804(b)(6) to apply, the prosecution must establish that the defendant acted with specific intent, and that the defendant " 'engaged in or encouraged wrongdoing that was *intended to, and did, procure the* unavailability of the declarant as a witness.' " *Burns*, 494 Mich at 113 (footnote omitted), quoting MRE 804(b)(6). The preponderance of the evidence standard will apply, and the trial court acts as the fact-finder in determining questions of fact that are preliminary to determining the admissibility of evidence. *Burns*, 494 Mich at 115, 117 n 39; MRE 104(a).

In this case, the prosecution presented taped telephone conversations between defendant and the complaining witness while defendant was lodged in jail awaiting trial. Having reviewed each of the conversations that the trial court heard, we conclude that these conversations prove, by a preponderance of the evidence that defendant " 'engaged in or encouraged wrongdoing that was *intended to, and did, procure the* unavailability of the declarant as a witness.' " *Burns*, 494 Mich at 113. Specifically, the conversations reveal that defendant threatened Hubbard's life on more than one occasion, threatening to kill her at her place of employment, and stating that he did not care who saw him kill her. In one conversation, defendant, in an angry, aggressive and confrontational tone also questioned Hubbard about why she testified against him at the preliminary examination. In the last telephone call that the trial court heard, defendant's demeanor is noticeably different. During the telephone call he encourages Hubbard to "stay away" from the court proceedings, and subsequently inquires of Hubbard "did they subpoena you?" At one point, defendant is heard stating, "don't worry about it then, just don't show up." Later in the call, defendant tells Hubbard, "be careful" and "remember this date" referring to the March 23, 2015 trial date, confirming that Hubbard knows the date after she recites it back to him verbally. Defendant also informs Hubbard that "we need to get me . . . out [of] this," referring to the trial court proceedings, and tells her, "lots of guys, [if] their girls don't show up, it's over with."

Finally, to the extent that defendant asserts that his Sixth Amendment right to confront the witnesses against him was violated when Hubbard's preliminary examination testimony was admitted, the *Burns* Court clearly stated that the forfeiture doctrine is an exception to the rule against hearsay, and likewise is an exception "to a defendant's constitutional confrontation right." *Burns*, 494 Mich at 111. In this case, the record clearly supports the trial court's conclusion that defendant intended that his threatening and manipulative calls to Hubbard would render her unavailable to testify at trial. *Id*. at 111, citing *Giles*, 554 US at 359-360. Accordingly, defendant is not entitled to relief.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Stephen L. Borrello

-8-