*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 18, 2020

Plaintiff-Appellee,

v

No. 346690
Grand Traverse Circuit Court

NICHOLAS CORY PERKINS,

LC No. 18-013042-FH

Defendant-Appellant.

Before: MURRAY, C.J., and JANSEN and MARKEY, JJ.

PER CURIAM.

Defendant was convicted of two counts of uttering and publishing a forged instrument, MCL 750.249j. Defendant was sentenced, as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of 24 to 336 months. We reverse, vacate defendant's convictions and sentences, and remand for a new trial.

## I. FACTUAL BACKGROUND

Defendant met Angela Bembeneck through his ex-girlfriend in the fall of 2016. Defendant explained that after he was released from unrelated incarceration in March 2017, Dylan Williams, Bembeneck's boyfriend, reached out to him and offered to let defendant stay at their apartment for a few days. Defendant agreed.

During that time, Bembeneck mentioned that "her brother had gotten pulled over on the way back from Detroit and he had got caught with some heroin and went to jail." Defendant testified that Bembeneck showed him a text message purportedly from her brother that asked her to use his business checks to get him released on bond: "So she had showed me a message on her cell phone saying that I got pulled over," "I got stuff on me, I'm going to jail," and "[u]se my checks to get me out." According to defendant, those texts were from someone named "Sam Mitchell," and after discussing it with them and seeing the text message, defendant agreed to help. Although somewhat suspicious, defendant said he was persuaded "because [he] had seen that message from Sam giving her authority to write the checks out . . . ."

According to defendant, both Bembeneck and Williams claimed that they lost their IDs and asked him to cash some checks for her brother to help get him out of jail. "And the next day I went and I cashed the first check," defendant admitted. He testified that the first check was for $698.15 and was dated March 2, 2017. When asked why the check's memo line stated "payroll," defendant explained that Bembeneck "told [him] that the reason for the payroll being on the check was because Sam Mitchell was overdrafting . . . . Writing checks for over the amount and . . . he said it was getting suspicious, so he told her to just write payroll on the check so it all looked legit."

Defendant testified that he successfully cashed the check at Cash Plus and received $698.15, which he immediately gave to Bembeneck. Defendant testified that he did the same thing the next day, on March 3, 2017, with a check for $672.47. According to defendant, Bembeneck said the second check was needed because "his bond got raised because of the smuggling charge." Bembeneck also said that "she needed about $2,500 to retain a lawyer" for Mitchell, so she needed him "to cash [a] third check" for $715.28. When defendant attempted to cash the third check at Cash Plus, the teller refused: "She told me that she wasn't going to cash the check because the account was flagged." Defendant testified that when he returned to the vehicle where Bembeneck and Williams were waiting and explained what happened, Bembeneck "said [Mitchell] was supposed to be calling her again that night," that "[s]he was going to get everything figured out," and that "[Mitchell] was going to call his parents to get everything situated . . . with his account."

Defendant moved out of Bembeneck's and Williams' apartment on March 6th or 7th. According to defendant, he did not keep any of the money from Cash Plus—"not a penny"—for himself. He claimed that he was trying to be helpful because he "was thankful that they were giving [him] a place to stay." "I was helping them out and they were helping me out," he said.

The jury ultimately convicted defendant of two counts of uttering and publishing forged instruments. Defendant was acquitted of a third count, and was sentenced as noted *supra*. This appeal followed.

## II. MISSING WITNESS INSTRUCTION

Defendant first argues that the trial court abused its discretion by failing to give the missing witness instruction, M Crim JI 5.12, with respect to the prosecution's failure to produce Bembeneck as a witness at trial.[1] We agree and further conclude that defendant is entitled to a new trial.

This Court reviews a trial court's decision regarding the prosecution's exercise of due diligence to produce an endorsed witness at trial and whether a missing witness instruction is appropriate for an abuse of discretion. *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014).

---

[1] We note that the prosecution did not file a brief on appeal in this matter.

"A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial." *Eccles*, 260 Mich App at 388. "It is the fact of endorsement, regardless of whether or not such endorsement is required, that puts the obligation of production on the prosecutor." *People v Cummings*, 171 Mich App 577, 585; 430 NW2d 790 (1988). If a prosecutor "fails to produce an endorsed witness," he or she may be excused from the obligation by showing "that the witness could not be produced despite the exercise of due diligence." *Eccles*, 260 Mich App at 388. "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "If the prosecution fails to produce a witness who has not been properly excused, the trial court has discretion in fashioning a remedy for the violation of MCL 767.40a, which may include a missing witness instruction." *People v Everett*, 318 Mich App 511, 519; 899 NW2d 94 (2017).

What actions taken by law enforcement or the prosecution constitute due diligence in locating an endorsed witness have been thoroughly discussed in Michigan jurisprudence. For example, in *Eccles*, this Court determined that the prosecution had exercised due diligence in locating a missing witness after the police officer in charge of the case interviewed witnesses at the home of the witness's mother, and attempted to serve the witness with a subpoena several times. *Eccles*, 260 Mich App at 389. When the witness failed to appear for trial, law enforcement contacted jails, hospitals, and morgues, as well as the police department of the city that the witness was supposedly living in. *Id*. at 390.

Comparatively, in *Bean*, the prosecution's attempts to contact a missing witness were limited to a few phone calls and a visit to an abandoned building that belonged to the witness's aunt, even after the prosecution learned that the witness may have relocated to Washington, D.C. *Bean*, 457 Mich at 687-689. Our Supreme Court determined that the prosecution failed to exercise due diligence to locate the missing witness. *Id*. at 690.

In this case, the trial court concluded that Bembeneck could not be produced despite the prosecution's exercise of due diligence; however, the record before us does not support that finding. The prosecution argued that law enforcement went "through pretty extensive efforts to find her[,]" including going "to her last known address, knock[ing] several times" one year before trial, "run[ning] the license plates on the vehicles that were there," speaking "with a neighbor" who confirmed that Bembeneck lived at the apartment, calling "[t]hree phone numbers," and even "tr[ying] personally to get in touch with" her. Additionally, the prosecution explained law enforcement "went to her last known address" just a couple of weeks before trial but was advised that she no longer lived there. According to the prosecution, there was no other information for law enforcement to act on.

However, there was much more the prosecution could have done to locate Bembeneck. For example, law enforcement could have gone to Bembeneck's last known residence more than

twice during a twelve-month period[2]; law enforcement could have conducted surveillance or remained at the house when the lights were on and it appeared someone was home; the prosecution could have contacted other local law enforcement agencies, governmental offices, jails, hospitals, or morgues to determine Bembeneck's whereabouts considering that Bembeneck was a frequent offender and possible confidential informant. Indeed, in an affidavit submitted to this Court, accepted into the record on appeal, MCR 7.216(A)(4), Bembeneck averred:

1. I used to work for Sam Mitchell. I would drive him around and do office work for him including emails, calls, and invoices.

2. While I worked for Sam he asked me to write checks for him out of his checking account.

3. At that time Sam had different people cashing checks for him.

4. Sam had a drug problem, and during this time period he was frequently traveling to Detroit to buy drugs.

5. I worked for Sam until he went to jail in late February 2017.

6. While Same was in jail he asked for money for his books and directed me to write checks out of his account to get the money.

7. The checks that Nick Perkins cashed were cashed with Sam's permission in order to get money to Sam.

8. I was not aware that Nick Perkins faced criminal charges as a result of those checks or that I was considered a witness in his case.

9. At the time of Nick Perkins' trial (October 2018) my whereabouts were known to the Grand Traverse County Circuit Court and Prosecutor's Office as I was either incarcerated or on probation in Grand Traverse County for the entire year of 2018.

   a. In January of 2018, I was incarcerated in the Grand Traverse County Jail, then released into a 30-day Community Corrections program.

   b. Following that I lived at Addiction Treatment Services (ATS) transitional housing and reported weekly to my probation officer.

   c. From June to October 2018 I was in the Grand Traverse County Jail.

---

[2] See *People v James (After Remand)*, 192 Mich App at 568, 571; 481 NW2d 715 (1992), where this Court concluded that due diligence considers not only the efforts expended in locating a missing witness, but also the *timing* of those efforts.

d. Starting in October 2018, I participated in a 28-day impatient program at Munson Hospital.

e. After that, I could have been located through my probation officer who had my address and to whom I regularly reported.

10. At no point did anyone come speak to me about Nick Perkins cashing checks for Sam Mitchell.

11. If called to testify, my statements would be the same as they are outlined above.

On the basis of the foregoing, we conclude that the prosecution failed to exercise due diligence in locating Bembeneck, and the trial court abused its discretion in finding otherwise.

Our inquiry does not end there. A missing witness instruction, given as a remedy for a violation of MCL 767.40a, is sometimes, but not always appropriate. *People v Perez*, 469 Mich 415, 420; 670 NW2d 655 (2003). Whether a missing witness instruction is warranted depends "on the specific facts of th[e] case." *Id*. at 420-421. Additionally, it is not enough for defendant to show he was entitled to a missing witness instruction. "[T]o warrant reversal for a violation of MCL 767.40a, defendant must show that he was prejudiced by noncompliance with the statute." *Everett*, 318 Mich App at 523 (citation and internal quotation marks omitted). And, "as the appellant in this case, defendant bears the burden of providing this Court 'with a record to verify the factual basis of any argument upon which reversal [might be] predicated.'" *Id*., quoting *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Any "[e]rror in the admission or exclusion of evidence does not warrant reversal if, in light of the other properly admitted evidence, it does not affirmatively appear more probable than not that a different outcome would have resulted without the error." *Id*. at 523-524 (citation and internal quotation marks omitted).

We conclude that not only was a missing witness instruction appropriate based on the facts of this case, but also that defendant has met his burden for reversal here. "Uttering and publishing consists of three elements: (1) knowledge on the part of the defendant that the instrument was false; (2) an intent to defraud; and (3) presentation of the forged instrument for payment." *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001) (citation and internal quotation marks omitted). The first and second elements, which concern defendant's knowledge and intent, were at issue in this case. Indeed, defendant's defense theory was that he did not know that the checks were false, and therefore he did not possess the requisite intent to defraud.

To establish defendant's knowledge and intent, the prosecution offered the following evidence: defendant's relationship with Bembeneck and Williams; defendant crumbling up the check and walking away after the third check was declined; and the fact that the checks had "payroll" in the memo line despite the fact that defendant admittedly never worked for Mitchell. This evidence, however, does not speak directly to defendant's knowledge or intent, which are requisite elements of uttering and publishing. We conclude that the evidence presented does not make it "affirmatively appear more probable than not that a different outcome would have resulted

without" Bembeneck's testimony or a missing witness instruction. *Everett*, 318 Mich App at 523-524 (citation and internal quotation marks omitted).

Where the prosecution failed to produce Bembeneck or exercise its due diligence in producing Bembeneck, defendant was prejudiced by the trial court's failure to give the missing witness instruction. Both parties relied on Bembeneck's role in this case. The prosecution argued that Bembeneck was the middleman between the theft of Mitchell's business account checks and defendant's cashing of the checks to establish defendant's guilt. Defendant claimed that Bembeneck had asked him to cash the checks and had shown him a text message purportedly from Mitchell granting Bembeneck permission to write the checks on Mitchell's business account. In her affidavit, cited *supra*, Bembeneck confirmed defendant's version of events, specifically that defendant had permission to cash the checks at issue.

Where defendant's knowledge and intent were at issue, not only would Bembeneck's testimony have aided the jury in its credibility determination, but also it would have helped to clear up the jury's confusion about whether Bembeneck had authority to write checks on Mitchell's behalf. Indeed, during deliberations, the jury inquired about whether Bembeneck had such authority because two checks written on Mitchell's business account in Februrary 2017 appeared to bear Bembeneck's signature. Again, in her affidavit, Bembeneck confirmed that she had authority to cash checks on Mitchell's behalf while she worked for him. Accordingly, we conclude that without the missing witness instruction, defendant did not receive the benefit that comes from allowing the jury to infer that Bembeneck's testimony would have been harmful to the prosecution's case. Accordingly, we conclude that reversal is warranted, and defendant is entitled to a new trial.

On appeal, defendant also raises issues of ineffective assistance of counsel and inaccurate scoring of the sentencing guidelines. In light of the foregoing, however, we decline to address these issues.

We reverse, vacate defendant's convictions and sentences, and remand for a new trial. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Kathleen Jansen
/s/ Jane E. Markey