# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL CRAIG WICKS,

        Defendant-Appellant.

UNPUBLISHED
July 26, 2018

No. 337937
Kalamazoo Circuit Court
LC No. 2016-001060-FH

Before: HOEKSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

Defendant appeals as of right his bench-trial convictions of carrying a concealed weapon (CCW), MCL 750.227, three counts of assault with a dangerous weapon (felonious assault), MCL 750.82, and three counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to 21 to 90 months' imprisonment for the CCW conviction, 21 months to 6 years' imprisonment for the felonious assault convictions, and to 2 years' imprisonment for the felony-firearm convictions, to be served concurrently to each other and consecutively to the CCW and felonious assault sentences. We affirm.

Defendant's convictions arise out of an incident in which defendant fired a handgun at a vehicle with three female occupants as the vehicle sped away from a home after the driver, while seated in her stopped vehicle, and defendant, while standing outside the vehicle, had engaged in a heated argument on the street outside the home of defendant's family. Just before the shooting, defendant had kicked the car, and the individual in the front passenger seat, the driver's daughter, then observed defendant pulling out a small, black handgun from a green bag tucked in defendant's shorts, at which point the driver's daughter told her mother to go. As they were driving away, the backseat passenger, the driver's daughter's friend, saw defendant standing in the middle of the road, pointing a small, black handgun at the car. The backseat passenger immediately ducked down, and all three occupants of the vehicle claimed that they then heard two or three gunshots ring out, although none of them observed defendant actually firing the gun. No shots hit the vehicle. The whole episode originated when defendant supposedly struck the driver's son in the head with a gun earlier in the day, with the driver then going to defendant's home, intending to confront his parents about the matter, which led to a verbal altercation with them. A short time later, after the driver and her passengers had left, they returned to defendant's house, having seen defendant driving in the area, and defendant also arrived at his home. It was at this point that defendant and the driver started arguing, with defendant asserting

-1-

that he had not hit the driver's son with a gun but that he had simply "slapped that bitch." The kicking of the driver's car and the shooting soon followed.

Defendant, who did not testify at trial, gave a statement to the police, claiming that the driver's son and the son's friends had earlier jumped defendant and that he merely defended himself and got away. In the statement to police, defendant further asserted that the driver's son then informed the driver that defendant had struck him with a gun. Defendant denied even having a gun. He told police that he and the driver's son did not get along because they were members of competing gangs. As to events around the time of the shooting, defendant claimed that after he had an argument with the driver outside his home, he ran away and two or three persons chased him, one of whom had a gun and shot at him, but he could not identify the shooter. Defendant's family members, his mother, father, and sister, who were at the house when events erupted, testified on defendant's behalf. His mother and sister claimed that the driver's son had earlier flashed a gun tucked in his waistband. Defendant's family testified that defendant left the house after kicking the driver's vehicle, as he feared that the police would be called. Defendant's mother stated that she saw several young men follow defendant as he left the area and that she then heard gunshots from about a block away from the family home. Defendant's father and sister testified that they also heard gunshots from about a block away from the house after defendant left. Defendant additionally presented the testimony of a male neighbor who stated that he heard a commotion outside his home, followed by gunshots about five minutes later. He testified that the gunshots sounded as if they were coming from a street or two over and "off in the distance."

The police discovered a bullet that had apparently been fired and a black .22 caliber pistol in the third floor master bedroom of defendant's home, but the police were unable to specifically connect the gun to the shooting, and defendant's father asserted that it was his gun, that it was old, and that his father had given it to him. No fingerprints were found on the gun. Defendant's mother claimed that she had picked up the bullet located in her bedroom from the street and that she frequently found bullets in the street, as shootings were common in the area. A spent .223 caliber casing was found in the basement of the house. There was no scientific evidence linking the bullet or the spent casing to the shooting.

Pertinent to this appeal, the trial court, sitting as the trier of fact, admitted into evidence: (1) an anonymous 911 call about the shooting; (2) a 911 call from an identified female neighbor who appeared and testified at defendant's preliminary examination but not at the trial; (3) the preliminary examination testimony of that neighbor; and (4) testimony about gang membership and affiliation.[1] With respect to the anonymous 911 caller, the caller stated that help was needed because a neighbor was shooting, confirmed, in a worried tone, that there were gunshots when asked for clarification by the 911 operator, identified defendant as the neighbor and as possessing a gun when asked by the operator if she knew the neighbor's name and whether he

---

[1] There were other 911 calls regarding the shooting admitted into evidence, but the admissibility of those tapes are not in dispute.

had a gun, and stated that defendant ran across the street into an alley. The caller did not provide any more information in the one-minute call, hanging up on the operator.

With respect to the female neighbor's 911 call, she told the operator that she witnessed her neighbor "pull out a gun and cock it and point it at this car full of girls." The operator asked if she knew the identity of the person with the gun, and she replied, "I don't know. Michael Wicks." The neighbor then informed the operator that defendant was at a house next door, that she heard an argument regarding defendant supposedly striking the driver's son, that she saw defendant kick the driver's car, and that she observed defendant's "daddy" attempting to hold him back. The neighbor further told the operator that she next witnessed defendant pulling a black gun out of his right pocket. She did not state that she saw defendant actually shooting the gun. The neighbor described defendant as a black male, about five feet seven inches tall, with "a little afro." She informed the operator that defendant was wearing a white shirt with gray shorts. The neighbor then reconfirmed the location of the incident, and she stated that her daughter told her that defendant "ran through the alley and got to shooting at some little boys." Finally, the neighbor reluctantly provided her name to the operator after initially voicing concerns about the safety of her daughter and herself.

At the preliminary examination, the female neighbor testified to having seen defendant start kicking the driver's vehicle, which had three female occupants, and being dragged backward by an older gentleman, at which point defendant pulled something out of his pocket, which the neighbor assumed was a gun. The neighbor testified that she then grabbed her six-year-old daughter and ran into her house, calling 911. The neighbor indicated that she heard a couple of gunshots while making the 911 call. On cross-examination, the neighbor acknowledged that she did not actually see a gun. She testified that, along with the three females in the vehicle, there were two males and two females outside the car,[2] none of whom she personally knew.

The trial court, ruling from the bench, found defendant guilty of all charges. The court noted that the "911 calls were helpful" and that they were "made contemporaneously with events that [were] occurring[,] specifically identifying the Defendant as taking the particular action as described by" the driver. The trial court did not find credible the testimony of defendant's family members, especially defendant's sister. The court found most credible the testimony of the backseat passenger, the driver's daughter's friend. The trial court did not expressly place any reliance on the neighbor's preliminary examination testimony when rendering the verdicts. Defendant now appeals.

The arguments posed by defendant on appeal mostly concern the admissibility of evidence, i.e., the anonymous 911 call, the neighbor's 911 call, the neighbor's preliminary examination testimony, and the statements by defendant regarding gang membership. Defendant also argues that the verdicts were against the great weight of the evidence.

---

[2] The four persons outside the car were apparently defendant and his father, mother, and sister.

First, defendant contends that the recording of the anonymous 911 call constituted inadmissible hearsay that denied defendant his right of confrontation. We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003). And this Court reviews de novo the issue whether a defendant was denied his or her constitutional right to confront complaining witnesses. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

Under the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" US Const, Am VI. Similarly, under the Michigan Constitution, "[i]n every criminal prosecution, the accused shall have the right . . . to be confronted with the witnesses against him or her[.]" Const 1963, art 1, § 20. The Confrontation Clause bars the admission of out-of-court *testimonial* statements unless the declarant was unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004); *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007).[3] "[T]he Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." *Chambers*, 277 Mich App at 10-11. Statements made during interrogations by law enforcement officers are generally testimonial in nature, because they are directed at establishing the facts of a past event in order to identify or provide evidence to convict the perpetrator. *Davis v Washington*, 547 US 813, 826; 126 S Ct 2266; 165 L Ed 2d 224 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. A question-and-answer exchange between a caller and an operator or dispatcher during a 911 call is not ordinarily designed to primarily establish or prove some past fact in an effort to gather evidence for charges; therefore, statements made during the course of a 911 call are generally nontestimonial. *Id.* at 827. This is true even with respect to an operator's effort to establish the identity of an assailant, so as to warn responding officers of whether "they would be encountering a violent felon." *Id.*

In *Michigan v Bryant*, 562 US 344, 370-371; 131 S Ct 1143; 179 L Ed 2d 93 (2011), the United States Supreme Court sharpened the analysis in *Davis*, holding:

> As we suggested in *Davis,* when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances

---

[3] The Confrontation Clause of the Sixth Amendment is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Tennessee v Lane*, 541 US 509, 523; 124 S Ct 1978; 158 L Ed 2d 820 (2004).

in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. As the context of this case brings into sharp relief, the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public. [Citation omitted.]

Here, with respect to the anonymous 911 call, defendant initially maintains that there was no ongoing emergency pertaining to the caller herself. This argument lacks merit, as there is no requirement that the 911 caller be the person at direct risk of harm from the danger posed by the ongoing emergency situation.[4] In *People v Walker (On Remand)*, 273 Mich App 56, 63-64; 728 NW2d 902 (2006), this Court stated:

In this case, . . . the 911 call, objectively considered, was a call for help, such that the statements elicited were necessary to resolve the present emergency, rather than learn what had happened in the past to establish evidence of a crime. The victim appeared at her neighbor's home, crying and shaking and seeking help in response to an alleged beating. She had reportedly escaped from defendant by jumping from a second-story balcony. The 911 call made by the neighbor was a call for help, as indicated at the outset of the call[.]

* * *

The subsequent questioning during the 911 call was directed at eliciting further information to resolve the present emergency and to ensure that the victim, the neighbor, and others potentially at risk, including the victim's eight-year-old son, would be protected from harm while police assistance was secured. The emergency operator sought details about the assault, including the location of the neighbor's home, the circumstances of the reported beating, the perpetrator's relationship to the victim, his name, and where he was, and where the child was. The operator attempted to calm the victim and the neighbor and reassure them that the police would be responding right away. . . . [T]he circumstances of the 911 operator's questioning objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [Citations and quotation marks omitted.]

As this passage from *Walker* makes clear, the 911 call must relate to a present or ongoing emergency, but the caller making the statements need not be the person at risk relative to the

---

[4] We shall give defendant the benefit of an assumption that the caller was not at risk of harm from the outdoor shooting in her neighborhood, which was not established one way or the other from the call itself or at trial.

circumstances surrounding the emergency. Indeed, as noted above, the United States Supreme Court in *Bryant*, 562 US at 371, observed that "the existence and duration of an emergency depend on the type and scope of danger posed to the *victim, the police, and the public*." (Emphasis added.) The question is not whether the caller is threatened by an ongoing emergency, but rather whether the call actually concerns an ongoing emergency that places a person or persons at risk. In the instant case, the anonymous caller was reporting a neighborhood shooting as events were evolving and unfolding, and the operator's questions, just as the questions directed by the operator in *Walker*, objectively indicated that the primary purpose of the inquiry was to enable police assistance to meet an ongoing emergency.

Defendant argues that "the anonymous call was testimonial as there was no ongoing emergency, [as] the caller was describing a past event with the purpose of naming a possible perpetrator." There is no evidentiary support for this contention. At the start of trial before testimony was taken, and in connection with a discussion of the 911 calls, the prosecutor stated, without objection or contradiction, that the shooting occurred at approximately 7:40 p.m., that the female neighbor's 911 call was made at 7:38:52 p.m.,[5] and that the anonymous call was made at 7:40:53 p.m. Accordingly, the anonymous call was plainly made during the course of an ongoing emergency. Moreover, in listening to the 911 call, one detects a clear sense of urgency and fright in the anonymous caller's voice. And the 911 operator was not making inquiries in order to establish or prove some past fact in an effort to gather evidence against defendant; she was asking questions as necessary to address a serious ongoing emergency to which police officers were responding. Defendant was not denied his right of confrontation with respect to the admission of the anonymous 911 call.

Although defendant frames the issue regarding the anonymous 911 call around the right of confrontation, in the body of his argument, defendant also maintains that the 911 call constituted inadmissible hearsay, given that the call was admitted to prove the truth of the matter asserted, i.e., that defendant possessed a firearm and was involved in the shooting. Although we need not address this argument because there is no reference to "hearsay" in the "statement of questions involved" relative to defendant's appellate brief, MCR 7.212(C)(5), we shall tackle the question in short order. Taking into consideration the timing of the anonymous 911 call in relation to the shooting, the fact that the caller perceived an incident involving gunfire, and given the tone of the caller's voice on the audiotape, the evidence easily falls under the "present sense impression" exception to hearsay, MRE 803(1),[6] or the "excited utterance" exception to hearsay,

---

[5] As can be gleaned by the neighbor's 911 call and her testimony at the preliminary examination, she observed defendant pointing a gun or something that she assumed was a gun at the car carrying the three females, at which time the neighbor ran inside to call 911, and during the call the shots were fired.

[6] "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

MRE 803(2).[7]  See *People v Hendrickson*, 459 Mich 229, 235-237; 586 NW2d 906 (1998) (911 call constituted a present sense impression under MRE 803[1]).  Reversal is unwarranted.

Next, defendant contends that he was denied his right of confrontation by the admission of the female neighbor's 911 call and her testimony from the preliminary examination.[8]  To the extent that defendant renews the arguments made in relation to the anonymous 911 call, we hold that the neighbor's statements made during her 911 call were also nontestimonial in nature.  The questions posed by the 911 operator to the neighbor objectively indicated that the primary purpose of the inquiry was to enable police assistance to meet what was clearly an ongoing emergency.  Furthermore, the statements made by the neighbor during the 911 call qualified as present sense impressions and/or excited utterances for purposes of exceptions to the hearsay rule.  MRE 803(1) and (2).[9]

With respect to the female neighbor's preliminary examination testimony, which was indisputably testimonial in nature, defendant argues that the female neighbor was not "unavailable" at trial for purposes of the Confrontation Clause and for purposes of the hearsay exception for former testimony that is only applicable when a declarant is unavailable, MRE 804(b)(1).  Defendant contends that the prosecution and the police failed to exercise due diligence in attempting to obtain her presence at trial.  Initially, we conclude that, assuming error, it was entirely harmless.  MCL 769.26; *Lukity*, 460 Mich at 495.  As indicated earlier, the trial court did not place any reliance on the preliminary examination testimony by the neighbor when rendering its verdicts.  Additionally, the testimony undermined the statements in the neighbor's 911 call, which was properly admitted into evidence, where, under oath at the

---

[7] "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

[8] The prosecution argues that defendant waived any argument that the neighbor's 911 call was inadmissible, where defense counsel expressly approved of its admission.  *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).  Although defense counsel affirmatively indicated that he had no objection to the admission of the 911 audiotape, counsel did so partly on the basis that the neighbor, an endorsed witness, would testify at trial.  It was not until the middle of trial that it was determined that the neighbor could not be produced as a witness.  Under those circumstances, we shall substantively address the issues.

[9] Defendant argues that the neighbor's reference, during the 911 call, to her daughter's assertion that defendant "ran through the alley and got to shooting at some little boys" was inadmissible double hearsay.  However, the daughter's statement would also constitute a present sense impression, MRE 803(1).  See MRE 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").  We also question whether any prejudice flowed from the challenged statement, considering that, while the daughter allegedly perceived defendant shooting a gun, it was not consistent with the prosecution's theory that he shot at the female occupants of a vehicle.

preliminary examination, the neighbor testified that she did not actually see a gun, and where it became clear that she did not actually see the shooting. Indeed, in closing arguments, defense counsel emphasized these points. If anything, the neighbor's preliminary examination testimony was used to defendant's benefit. In light of the admissibility of the neighbor's 911 call, we fail to see any harm or prejudice to defendant with respect to admitting the preliminary examination testimony.

Moreover, the trial court did not abuse its discretion in finding that the state exercised due diligence in attempting to secure the neighbor's attendance at trial. "Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). In *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998), our Supreme Court expressed:

> The test for whether a witness is "unavailable" . . . is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it. The trial court's determination will not be disturbed on appeal unless a clear abuse of discretion is shown. [Citations omitted; see also MRE 804(a)(5) (requiring due diligence to procure a declarant's attendance and testimony in criminal case before finding declarant unavailable).]

Here, the prosecutor informed the trial court that the police unsuccessfully attempted to serve the female neighbor with a subpoena at least 10 different times. Officers across two different shifts sat and observed the neighbor's house. One officer knocked on the door of the house upon seeing a woman matching the neighbor's description, and a young child answered the door and indicated that her mother was home. However, an adult male then came to the door and stated that she was not at home. The officer then called the residence, and an adult male answered. It appears that he provided the officer with a phone number to get in touch with the neighbor, which was accomplished. The neighbor told the officer that she knew about the trial and would be attending. The neighbor also stated that she would be working until shortly after midnight. A night shift officer sat and watched the house, and the officer went to the door when he believed the neighbor had returned home. The officer knocked on the door for such a long time that someone from the residence called the police, and a dispatcher told the caller that an officer was attempting to serve the neighbor with a subpoena. Nevertheless, no one answered the door. All of these efforts appeared to have occurred the day before trial started. Defense counsel accepted the prosecutor's statements and did not demand supporting testimony of the efforts, but he did argue in cursory fashion that there was no due diligence, as it appeared to be a "last minute" effort by police.

Although the police apparently waited until the day before trial to serve the neighbor, we cannot conclude that the trial court abused its discretion in finding that due diligence was exercised. The officers took reasonable, good-faith, and even extraordinary measures to try and serve the neighbor, and it appears clear that she, for whatever reason, perhaps the fear that she communicated to the 911 operator, was avoiding service of the subpoena. Defendant argues that

the prosecution should have obtained an arrest warrant to secure her presence. However, as indicated in *Bean*, 457 Mich at 684, the test is one of reasonableness and whether diligent good-faith efforts were made to procure the testimony of a declarant, not whether more stringent efforts would have produced the testimony. We also question whether the neighbor would have testified against defendant even if taken into custody. Reversal is unwarranted.

Defendant next argues that he was denied a fair trial by the admission of statements regarding gang membership and affiliation, considering that such evidence was irrelevant, unduly prejudicial, and had no bearing on the motivation for the shooting. On this unpreserved issue, we hold that defendant has failed to establish plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Gang membership and affiliation explained the dynamics of the situation that arose between the driver's son and defendant, giving context to the events that transpired shortly thereafter and eventually the shooting. Some of defendant's hostility and anger exhibited toward the driver's son and the driver could certainly have been motivated by gang-related animus, serving, in part, to show motivation for the shooting. Applying MRE 401-403, we cannot conclude that the trial court plainly erred in not excluding the evidence *sua sponte*.

Furthermore, defendant fails to show the requisite prejudice. Defendant's story to police was that he was chased by two or three individuals, one of whom had a gun and shot at defendant. Gang membership and affiliation would support the possibility that perhaps there were persons seeking to harm defendant, increasing the likelihood that defendant's statements to police were true, which might explain why defense counsel did not object to the evidence. Additionally, this case entailed a bench trial, and "[a] judge, unlike a juror, possesses an understanding of the law which allow him to ignore . . . errors and to decide a case based solely on the evidence properly admitted at trial." *People v Taylor*, 245 Mich App 293, 305; 628 NW2d 55 (2001) (quotation marks omitted). There is no indication in the trial court's fairly lengthy ruling on the record that gang membership or affiliation was contemplated for any improper or nefarious reasons; it was just briefly mentioned. Instead, the trial court's narrative and reasoning revealed that the court based the verdicts solely on evidence properly admitted at trial. As mentioned above, the trial court found particularly compelling and credible the testimony of the backseat passenger who testified to observing defendant point a small, black handgun at the car moments before shots were heard, giving rise to a reasonable inference that defendant shot at the vehicle. Reversal is unwarranted.

Defendant lastly argues that the verdicts were against the great weight of the evidence, where the testimony of the three female victims of the felonious assault was patently incredible and defied physical realities, considering that the victims did not see defendant fire any shots and that the evidence established that the shooting occurred a block or two away. We disagree.

The female neighbor indicated in the 911 call that she observed defendant "pull out a gun and cock it and point it at this car full of girls." The backseat passenger, whom the court found so credible, testified that she also saw defendant pointing the gun at the car and ducked down, and when asked how quickly after observing the gun did she hear gunshots, she responded, "right after I got down, I heard the shots." And the driver testified that she heard shots "almost immediately" after taking off when it was indicated that defendant had a gun. The front-seat

passenger, the driver's daughter, testified that she heard the gunshots "as soon as we pulled off and was getting ready to turn."

Defendant has failed to demonstrate that the evidence showing that he committed the offenses contradicted indisputable physical facts or law, was patently incredible, defied physical realities, was so inherently implausible that a reasonable juror could not believe the evidence, or was so seriously impeached that it was deprived of all probative value. *People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998); *People v Bosca*, 310 Mich App 1, 13; 871 NW2d 307 (2015). The fact that no one testified to actually witnessing defendant fire the gun at the car and that there was testimony of gunshot sounds coming from a block or two away did not make the victims' testimony patently incredible or in defiance of physical realities. It was reasonable for the trial court to infer from the testimony that defendant shot at the car. Because there were no exceptional circumstances, the issues concerning the credibility of the witnesses and the resolution of conflicting testimony were for the judge to determine, not this Court. *Lemmon*, 456 Mich at 642-643. In sum, the evidence did not preponderate so heavily against the verdicts that it would be a miscarriage of justice to allow them to stand. *People v Musser*, 259 Mich App 215, 218-219; 673 NW2d 800 (2003).

Affirmed.

/s/ Joel P. Hoekstra
/s/ William B. Murphy
/s/ Jane E. Markey