*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ADONIS DREY WILSON,

Defendant-Appellant.

UNPUBLISHED
February 13, 2026
9:27 AM

No. 369574
Oakland Circuit Court
LC No. 2020-273472-FC

Before: CAMERON, P.J., and M. J. KELLY and YOUNG, JJ.

PER CURIAM.

Defendant, Adonis Wilson, appeals as of right his jury-trial convictions of felony murder, MCL 750.316(b), second-degree arson, MCL 750.73(1), mutilation of a human body, MCL 750.160, and torturing of an animal, MCL 750.50b. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On the morning of August 27, 2019, the fire department responded to reports of a fire at Stefanie Steinberg's house in Waterford. Inside, they discovered her charred remains in the living room. A propane cylinder was under her body and a broken knife was stuck in her neck. Due to the severity of the burns, her body could not be visually identified. The fire marshal determined that the fire was non-accidental and was caused by humans. In addition to the prone cylinder positioned beneath Stefanie's body, analysis of her home revealed that the carpet had been doused in accelerants and other propane cylinders had been scattered in the area. Stefanie's dog, a small brown chihuahua, was rescued from the home. Evidence from the scene suggested that he had been trapped in a plastic dog crate near the fire's origin. Plastic from the crate was scalded to his body. He was burned in multiple places, including his eyes, and suffered from smoke inhalation. Stefanie's autopsy revealed that her cause of death was multiple stab wounds and that she had been dead at the time that the fire was set.

The police identified Wilson as a person of interest as a result of reports that he had cut Stefanie's grass the day before and had later been seen with her at approximately 10:30 p.m. Additionally, a letter signed by someone named "Sarah" was found in the house near other paper

that appeared to have been used in starting the fire. The police were able to connect Wilson to a woman named Sarah Sparks. When asked about the letter, Sparks admitted that she had written the letter and left it for Wilson in a late model white minivan that he used in his lawn care business. Sparks was the owner of minivan.

Sparks initially provided Wilson with an alibi for the night of the murder and the fire by telling the police that he had been with her at her parents' house for the entire evening. However, when the police questioned Wilson's mother, they learned that Wilson had arrived at her house around 1:00 a.m. on August 27, 2019, with Sparks and their two young children. He then left the house alone, returned briefly, and then left the house with Sparks. Additionally, trail cam footage from Sparks's parents' house showed Wilson, Sparks, and their children leaving Sparks' parents' house around 12:30 a.m. on August 27, 2019.

Upon further questioning, Sparks admitted that she had lied by giving Wilson a false alibi. She told the police that Wilson arrived at her parents' house and that they left together for Wilson's mother's house. Wilson was upset and anxious. He left alone. Surveillance footage near Stephanie's residence suggests that Wilson was in that same area driving the white van shortly after he left his mother's home. When he returned, he kept washing his hands. Sparks asked him what was wrong. He decided to tell her privately, so they left the children with his mother and drove around in the minivan. He confessed to Sparks that he had tried to rob Stefanie, but she had resisted and threatened to call the police. He then stabbed her in the neck with a knife taken from her counter. The knife broke, so he grabbed another and stabbed her again. Cell phone location data suggests that Wilson took Stephanie's cell phone because her cell phone and his cell phone traveled together toward Sparks's parents' house after midnight on August 27, 2019.

Sparks and Wilson eventually drove by Stefanie's house while the fire department was on scene. Wilson questioned whether the fire was still burning. Eventually, he expressed to Sparks that he was going to leave Michigan. He sought money from his uncle, but did not receive any. The last location data for his cell phone indicated that he was in Akron, Ohio. He was later pulled over for a speeding infraction in Pennsylvania. He provided the trooper with both a false name and date of birth and claimed to have lost his license. When a search of the vehicle's identification number (VIN) revealed it was owned by Sparks and was connected to Wilson, the Pennsylvania trooper took Wilson into custody for an infraction of Pennsylvania law. Michigan law enforcement then traveled to Pennsylvania to interview him. A search warrant was obtained for the vehicle, which appeared to have blood on the pedals, smelled of kerosene or gasoline, and had a bottle of suspected urine in the cup holder.

Wilson was arrested and charged with multiple crimes in connection to Stefanie's murder. Sparks testified against him at the preliminary examination. However, years later, she recanted her testimony in an e-mail sent to the prosecution and in a video conference with law enforcement. She then failed to appear at Wilson's trial when ordered to do so and was deemed unavailable. As a result, her preliminary examination testimony was provided to the jury as substantive evidence against Wilson. Following a jury trial, Wilson was convicted as indicated above. He appeals now as of right.

## II. SPEEDY TRIAL

### A. STANDARD OF REVIEW

Wilson argues that he was denied his right to a speedy trial. Because he did not raise this issue in the trial court, it is unpreserved for appellate review. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) (explaining that an issue is preserved if it is raised before, addressed, or decided by the trial court).[1] We review unpreserved issues for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

### B. ANALYSIS

Criminal defendants have a constitutional right to a speedy trial that is guaranteed by the United States Constitution and by the Michigan Constitution. US Const, Am VI; Const 1963, art 1, § 20. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest. *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). A balancing test is used to determine whether a defendant has been deprived of his or her constitutional right to a speedy trial. *Id.* Courts must consider "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id.* at 261-262. "These factors are often known as the *Barker* factors, as they were first announced by the United States Supreme Court in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972)." *People v Smith*, ___ Mich App ___, ___; ___ NW2d ___ (2024) (Docket No. 362114); slip op at 3 n 1. Here, Wilson was arrested September 2, 2019. Trial was held September 18, 2023. Accordingly, the length of the delay was approximately 48 months.

Under the first *Barker* factor, "[f]ollowing a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Williams*, 475 Mich at 262. The prosecution concedes that prejudice is presumed because the delay in this case exceeded eighteen months. "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id.* As a result, we turn to the remaining factors.

Wilson argues that the second *Barker* factor also favors a finding that he was deprived of his constitutional right to a speedy trial. We disagree. When assessing this factor, courts "may consider which portions of the delay were attributable to each party . . . and may attribute unexplained delays—or inexcusable delays caused by the court—to the prosecution." *Smith*, ___ Mich App at ___; slip op at 3 (quotation marks and citation omitted). Review of the record in this

---

[1] Wilson raised two issues in the trial court that related to the delay in bringing his case to trial: a violation of the 180-day rule and a violation of MCL 780.601 (providing that a defendant arrested on an interstate detainer agreement should be brought to trial within 120 days). Neither is sufficient to raise an alleged violation of Wilson's right to a speedy trial.

case confirms that a large portion of the delay was attributable to the COVID-19 pandemic. Delays caused by COVID are not attributable to the prosecution. *Id*. at ___; slip op at 1.

Additionally, throughout the COVID-19 pandemic, Wilson repeatedly changed lawyers, resulting in his new lawyers requesting adjournments so that they could prepare for his defense. Although the COVID pandemic severely restricted the number of trials that could be held, the record reflects that, even in the absence of COVID delays, the defense was taking actions that would have resulted in a delay of the trial.

Even after the pandemic was no longer an impediment to bringing the case to trial, the defense continued to cause additional delay. Some delay was caused by defense motions and by the defense's need to wait to hear back from witnesses it retained using court funds. Additionally, Wilson continued to change lawyers, including retaining a new lawyer weeks before his case was scheduled to go to trial. That lawyer inexplicably failed to appear for trial, which resulted in significant additional delay. He also failed to appear for a prosecution motion, which resulted in an adjournment of that motion. Wilson consented to the delay caused by his lawyer's failure to appear. He also consented to the delay caused by that lawyer ultimately withdrawing from the case shortly before trial was scheduled to proceed.

On appeal, Wilson contends that some delay was caused by the case being assigned to different judges. However, having reviewed the record, we are convinced that any such delay was negligible in light of the repeated defense motions to adjourn the matter and the defense's failure to be prepared to proceed with scheduled trial dates and motion hearings. Rather, given the overwhelming record evidence indicating that the delay was caused by either COVID-19 or the defense, any minimal delay caused by the reassignment of the case from one judge to another is not sufficient to warrant weighing the reasons for the delay in favor of the defense.

The third *Barker* factor looks to the defendant's assertion of the right to a speedy trial. *Williams*, 475 Mich at 261. Here, Wilson never raised a speedy-trial violation in the trial court. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Smith*, ___ Mich App at ___; slip op at 6 (quotation marks and citation omitted). And, although Wilson raised other delay-related issues, he stated on the record at multiple hearings that he was waiving those challenges because he wanted to adjourn the matter for reasons related to one of his multiple lawyers' failure to appear for trial and his withdrawal as counsel. This factor, therefore, does not weigh in favor of finding a speedy trial violation.

The final *Barker* factor looks at prejudice to the defendant. *Id*. at 262. In *Smith*, this Court explained:

> There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense. Pretrial incarceration necessarily results in a degree of prejudice to the person. And while anxiety caused by a lengthy delay can occur, anxiety alone cannot establish a speedy-trial violation. Yet impairment of defense is the most serious form of prejudice in the context of a speedy-trial claim because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. Loss of memory caused by the passage of time can

also prejudice the defense. But in considering prejudice, a reviewing court should look for examples about how the delay between arrest and trial harmed the defendant's ability to defend against the charges. [*Smith*, ___ Mich App at ___; slip op at 6 (quotation marks, citation, and alterations omitted).]

Here, prejudice is presumed given the length of delay, and Wilson likely suffered some amount of personal prejudice given the amount of time he spent in jail. Wilson cannot establish, however, that he suffered prejudice to his defense. He contends that the delay caused the loss of Sparks's in-person testimony. Yet, as will be explained more fully below, the prosecution expended considerable efforts to bring Sparks to trial. And, although she was declared an unavailable witness on the second day of trial, she appeared on the third day of trial, and the court ordered that she be available to testify if the defense desired to call her as a witness. The defense ultimately chose not to do so. Wilson's lawyer indicated his belief that Sparks intended to invoke the Fifth Amendment, an opinion apparently based upon evidence that Wilson directed Sparks to plead the Fifth Amendment during their recorded jail conversations. Thus, the defense deemed it proper to waive Sparks's in-person testimony, and Wilson orchestrated Sparks's stated desire to plead the Fifth Amendment. The loss of her in-person testimony, therefore, was not caused by the delay in bringing the case to trial. Consequently, the final *Barker* factor does not weigh in favor of a speedy trial violation.

In light of the foregoing, Wilson has not established plain error related to his speedy-trial claim.

## III. UNAVAILABLE WITNESS

### A. STANDARD OF REVIEW

Wilson next argues that the trial court erred by deeming Sparks to be an unavailable witness, thereby allowing her preliminary examination testimony to be admitted at his trial as substantive evidence of his guilt. Because Wilson did not argue that Sparks's preliminary examination testimony was inadmissible as a result of the prosecutor's failure to show due diligence to produce her for trial, this issue is unpreserved. See *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003) (stating that "[a]n objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground."). Unpreserved challenges to a trial court's evidentiary decisions are reviewed for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763.

### B. ANALYSIS

Under MCL 768.26, the prosecution has a statutory right to use a witness's former testimony "whenever the witness giving such testimony cannot, for any reason, be produced at the trial . . . ." Under MRE 804(b)(1), a witness's former testimony is admissible if the witness is unavailable for trial and was subject to cross-examination during the prior testimony. *People v*

-5-

*Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009); MRE 804(b)(1).[2]  A witness may be declared unavailable for multiple reasons.  MRE 804(a).  As relevant here, a declarant is considered unavailable as a witness if he or she "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown."  MRE 804(a)(5).[3]  "The test for whether a witness is 'unavailable' as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial."  *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998).  "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it."  *Id.*

The trial court found that the prosecutor had exercised due diligence to procure Sparks's attendance at trial.  The court, therefore, declared her unavailable as a witness and held that the prosecutor could admit as substantive evidence the video of Sparks's preliminary examination testimony.  That ruling was not plain error.  The prosecutor clearly exercised due diligence in attempting to secure Sparks's testimony at trial.  Prior to trial, the prosecutor filed multiple motions with the trial court in Michigan and with the relevant court in Nevada to obtain a subpoena to compel Sparks's testimony at Wilson's trial.  After securing a Nevada order compelling Sparks's attendance, the prosecutor booked a flight for her and her family and a hotel for the duration of her stay.  When Sparks missed her flight, the prosecutor rebooked a "red-eye" flight.  Sparks missed that flight too.  Although the prosecutor made multiple attempts to communicate with Sparks via telephone, the calls went unanswered.  The prosecutor also learned from Sparks's parents that Sparks was still in Nevada, that she had changed her telephone number again, and had moved out of their house.  Given the extensive efforts exercised by the prosecution, Wilson cannot show error, much less plain error, in the trial court's declaration of Sparks as an unavailable witness.

Rather than challenge the trial court's initial finding of due diligence, Wilson argues that due diligence must not have been exercised because Sparks appeared on the third day of the trial.  Sparks, however, was compelled to appear on the second day of trial.  The matter, accordingly, was properly addressed at that time.  The fact that she later appeared did not render her available for trial on the day and time that she was compelled to appear.  Moreover, there is no indication in the record that she communicated to the prosecutor that she had unilaterally decided to arrive on the third day of trial instead of the second day.  Rather, the prosecutor explained that after the second day of trial had concluded it received notice that Sparks "had changed all of the reservations and has just arrived" and was outside the courtroom.  The defense lawyer expressly agreed with that description.  The court noted its frustration with Sparks's decision to "choose her own adventure as it relates to her compliance level with the subpoena and the travel."  The court asked

---

[2] To the extent that Wilson raises a Confrontation Clause challenge on appeal, a witness's former testimony is also admissible under the Confrontation Clause of the Sixth Amendment if the witness is unavailable for trial and if the witness was subject to cross-examination during his or her prior testimony.  *Garland*, 286 Mich App at 7.

[3]  The Michigan Rules of Evidence were amended effective January 1, 2024, and MRE 804 was again amended effective April 11, 2024, and effective May 1, 2024.  We cite the version of the evidentiary rules in effect at the time of Wilson's trial.

whether the prosecution intended to call her as a witness. The prosecutor stated he did not, but he added that Sparks was now available and present should the defense want to call her as a witness. The court ordered Sparks to be available for the remainder of the trial. In light of the foregoing, Sparks's appearance on the third day of trial did not render her available on the second day of trial.

Wilson also maintains that the prosecutor preferred to have Sparks's preliminary examination testimony as opposed to her in-person testimony. In support, he notes that the prosecutor filed a pre-trial motion seeking admission of the preliminary examination testimony. The prosecution stated at the motion hearing that it was concerned that Sparks would not testify consistently with her preliminary examination testimony. Nothing in the record indicated that the prosecutor did not want her to appear. Indeed, the prosecutor's herculean efforts to compel her attendance at the trial refute Wilson's claim that the prosecutor did not want her to appear for trial.

In sum, there is no error related to the trial court's declaration that Sparks was unavailable as a witness. Reversal is not warranted.

## IV. HEARSAY

## A. STANDARD OF REVIEW

Wilson argues that the trial court abused its discretion by admitting several hearsay statements made by Sparks. Specifically, he contends that Sparks's statements to the victim's sister, Heather Shell, were inadmissible, as were some of Sparks's statements in a recorded police interview. He also challenges Detective Alan Knapp's testimony that Sparks changed her story several times and eventually recanted her preliminary examination testimony. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Wilson did not object to Shell's testimony or to Sparks's statement during the recorded police interview. Review of those evidentiary challenges is, therefore, for plain error affecting Wilson's substantial rights. See *Carines*, 460 Mich at 763. Wilson's lawyer objected to the admission of Detective Knapp's testimony, but did so on a different basis. As such, that issue is also unpreserved and is reviewed for plain error. *Id.* Further, "[w]hen no *Ginther*[4] hearing has been conducted, our review of the defendant's claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

## B. ANALYSIS

As a general rule, hearsay is inadmissible. MCR 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). A statement is, by definition, not hearsay if

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . . [MRE 801(d)(1).]

Wilson contends that Sparks's statements to Shell, to Detective Knapp, and during the recorded police interview were hearsay under MRE 801(d) and did not fall within the hearsay exemption in MRE 801(d)(1).

However, Sparks was deemed to be unavailable, and her preliminary examination testimony was played for the jury under the exception for former testimony. See MRE 804(a)(4). As a result, under MRE 806 her credibility could be attacked "by any evidence which would be admissible for those purposes if [she] had testified as a witness." MRE 806. Although MRE 613(b) generally requires that the declarant be "afforded an opportunity to explain or deny" the inconsistent statement, MRE 806 expressly provides that the declarant need not be given such an opportunity.

Wilson suggests that only prior *consistent* statements can be admitted under MRE 806. Yet, there is no language in MRE 806 precluding the admission of inconsistent statements, such as statements recanting the admitted former testimony. Instead, the evidentiary rule expressly allows for the admission of *inconsistent* statements without regard to the requirement in MRE 613 that the declarant be given the opportunity to explain or deny the inconsistent statement. See MRE 806. Wilson's attempt to limit the applicability of MRE 806 to prior consistent statements is, accordingly, without merit. Wilson also directs us to *People v Blackston*, 481 Mich 451, 461; 751 NW2d 408 (2008) for the proposition that a prior statement must qualify for admission "under some other hearsay exception." *Blackston*, however, indicates that evidence admitted under MRE 806 is subject to MRE 403's balancing test. *Id*. There is no language indicating that it must independently satisfy another hearsay exception. Regardless, where the prior inconsistent statements are offered for impeachment under MRE 613 and are *not* being offered to prove the truth of the matter asserted, there is no need to satisfy any hearsay exception because the prior inconsistent statements are not hearsay by definition. See MRE 801(c).

With that legal background in mind, we first consider whether Detective Knapp's testimony regarding Sparks's recantation was admissible. Although Sparks had initially provided an alibi for Wilson, Wilson's mother's provided information inconsistent with that story. As a result, the police interviewed Sparks multiple times. During the third interview, Sparks changed her story. According to a police detective, Sparks disclosed to them that Wilson had left his mother's house by himself, that he returned in a panic, and that he told her that he had screwed up their lives. During a fourth interview, Sparks admitted that Wilson had confessed to her that he had stabbed Stefanie to death, that he had used multiple knives, and that the first knife broke off in Stefanie's neck when he had stabbed her. The police did not tell Sparks that Stefanie had been stabbed multiple times or that there was a broken knife located in her neck.

In her testimony, Sparks admitted that she lied when she first spoke to the police, in part, because she loved Wilson. She admitted further that she had an ongoing drug problem at the time of the murder and that she would lie to obtain or procure drugs. She acknowledged that, at times,

she would lie or tell the truth depending upon whether it would benefit her. Sparks then testified that the police told her that they were going to charge her with murder, arrest her, and lock her up. She said that she also got the impression that the police would take her children away, although the police had not actually threatened to do so. Instead, she only told Wilson that the police had threatened to take her children away. She testified that one of the reasons she changed her story was because she thought she would get charged, arrested, and lose her children. She stressed that she provided a false alibi to protect herself and her children "and because I couldn't hold onto that information anymore."

More than a year after the preliminary examination, Sparks and Wilson began communicating again. Detective Knapp testified that during the communications, Sparks sent Wilson "sext" messages, including photographs captioned with words indicating that Sparks's "booty is the sole property of Adonis Wilson." She also sent messages indicating that she loved Wilson, referring to herself as his wife even though they were not married, and indicating that she was working on retaining a lawyer for him. Wilson directed her to plead the Fifth Amendment at trial. Sparks contacted the police and recanted her statements made during the police interview and during her preliminary examination testimony.

Sparks's initial statements and her statements retracting her testimony and her earlier statements to the police were plainly inconsistent with her preliminary examination testimony and so were admissible under MRE 806. Further, under MRE 613, her inconsistent statement could be impeached with extrinsic evidence. Detective Knapp's testimony regarding her inconsistent statements, therefore, was admissible under MRE 806 and MRE 613. It did not need to independently satisfy a hearsay exemption under MRE 801(d) or a hearsay exception under MRE 803 or MRE 804 because the recantation statements were not hearsay.[5]

We next consider Wilson's claim that Sparks's statements to Shell are inadmissible hearsay. First, according to Shell, during a 2021 telephone conversation, Sparks stated that Wilson was "egotistical" and was a "psychopath." The prosecution, however, asserts that this statement was not hearsay because it was not offered to prove the truth of the matter asserted, i.e., that Wilson was egotistical or that he was a psychopath. Again, by definition, a hearsay statement must be offered to prove the truth of the matter asserted. MRE 801(c). Further, Sparks's motivation for testifying against Wilson (and making statements incriminating him to the police) had already been called into question during Sparks's testimony. The prosecution contends that this particular statement was offered to show Sparks's opinion of Wilson at a time when she was making the statements implicating Wilson, which would go to her credibility. Consistent with that stated purpose, the prosecutor specifically asked Shell whether, based upon the content of the conversation, Sparks gave any indication that she wanted to be involved with Wilson. Shell testified that she got the impression Sparks did not want anything to do with Wilson. We conclude that, because the statement was intended to go to Sparks's credibility because it was not offered to

---

[5] The matter asserted in the recantation statements was that Sparks had lied in her earlier testimony and statements to the police, that she had been coerced by the police into making statements incriminating Wilson, and that Wilson had not confessed the murder to her.

-9-

prove the truth of the matter asserted, it is not hearsay. There is no need, therefore, for the statement to satisfy a hearsay exemption or exception.

Next, Wilson challenges "messages" sent from Sparks to Shell. The first message is a Facebook message that was admitted into evidence without objection as exhibit 142, and it was read into the record:

> Hi. I know you don't know me and I don't know you. But I see that you are the sister of Stefanie Steinberg. I am [Wilson's] ex-fiancé [sic]. I'm the mother of two—his two children. First, I want to say I'm so sorry for what happened to her and I wanted you and your family to know that after that tragedy—tragedy took place, he came and told me what happened and what he had done. Also, I want you to know that I testified on Stafanie's (sic) behalf against [Wilson] yesterday in court. My deep—deepest condolences go to her son and to the rest of the—of you all. I know you bad—I know how badly this has affected me and my children and family. So, I cant (sic) even imagine how it has affected all of you. I know me testifying won't bring her back but I hope that me telling her side of the story will bring justice and at least some closure to her and to her—to all of her family and friends. I just wanted to reach out so you know that the people on the other side of the fence are deep—deeply about what happened—care deeply about what happened. And that you're constantly in our prayers. I'm doing my part to make sure he has to deal with the consequences for his actions. Thank you. And forever in my thoughts and prayer (indiscernible).

Because Wilson's lawyer affirmatively stated that he had "[n]o objection" to the admission of this message, any error in relation to its admission has been waived. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (defining waiver as "the intentional relinquishment or abandonment of a known right" and stating that waiver extinguishes error leaving nothing for an appellate court to review).

Sparks also sent several text messages to Shell. The messages included comments that Sparks was "doing" her part to ensure that Wilson had to deal with the consequences of his actions, that she hoped the process would go quickly so that everyone could "move on," and that she felt for Shell's family. Screenshots of those messages were admitted into evidence as exhibit 143. Again, Wilson's lawyer expressly stated that he had "[n]o objection" to the admission of the messages, thereby waiving any error in their admission. See *id*.

Finally, Wilson argues that statements that Sparks made during a recorded police interview were inadmissible hearsay. Specifically, after telling the police that Wilson had told her that he had stabbed the victim to death, the police left the room. Sparks then apologized to Wilson. This statement appears to be offered to prove the truth of the matter asserted, i.e., that Sparks was sorry that she was implicating Wilson. However, it was admissible under MRE 803(3), which, at the time of trial, provided that a hearsay statement is admissible if it is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as . . . mental feeling . . .), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Here, the statement related to her then-existing mental state of being remorseful that she had

recanted her initial statements indicating that Wilson was with her all night to reveal that he left her for a time and that when he returned to the house he confessed to her that he had stabbed Stefanie to death.

In sum, Sparks's statement to Detective Knapp is admissible impeachment evidence under MRE 806 and MRE 613. Sparks's statement to Shell that Wilson is "egotistical" and a "psychopath" is likewise admissible under MRE 806 and MRE 613 as evidence impeaching the recantation of her preliminary examination testimony. Wilson waived any challenge to Sparks's statements in the Facebook message and text messages to Shell by affirmatively agreeing to its admission without objection. Finally, Sparks's statement in the recorded police interview was admissible hearsay under MRE 803. Wilson cannot, therefore, establish plain error in relation to the admission of the statements.

Moreover, assuming arguendo, that the admission of the statements was error that is clear or obvious, Wilson cannot establish that it affected his substantial rights. To show that a plain error affected his substantial rights, Wilson must establish "that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. In light of the overwhelming evidence of guilt, he cannot meet that burden.

Wilson was observed cutting the grass at Stefanie's house the day of the fire. Later, around 10:30 p.m. a neighbor saw him speaking with Stefanie in her back yard. Wilson confessed to Sparks that he attempted to rob Stefanie, but that she had resisted. The presence of Stefanie's cell phone moving along the same route as Wilson's cell phone indicates that, at least initially, he stole Stefanie's cell phone after murdering her. There was no connection between Sparks and Stefanie that would account for that late-night travel.

Wilson told Sparks that he stabbed Stefanie in the neck with a knife and that the handle of the knife had broken off. He then stabbed her with a second knife. The physical evidence revealed that Stefanie had been stabbed in the neck and that the knife had broken in the process. It also showed that she had been stabbed multiple times. The police did not disclose those details to Sparks. Sparks explained—and video evidence confirms—that she had left the house with Wilson after he arrived. They went to Wilson's mother's house. Wilson left alone, a fact confirmed by his mother and by Sparks. Video footage suggests that he took a late model white minivan belonging to Sparks back to Stefanie's house. When he returned, he left his children with his mother and drove off with Sparks.

Sparks testified that Wilson admitted the murder to her at that time. She admitted further that her initial statements to the police were a lie. Evidence was admitted that Wilson reached out to a family member in California for financial support. And when he did not receive it, Wilson fled the state in Sparks's van, traveling through Ohio to Pennsylvania. He was pulled over for speeding. He provided the officer with a false name and date of birth. An examination of the van revealed a soda pop bottle that appeared to be filled with urine in the vehicle and the vehicle smelled of kerosene. The physical evidence from the scene revealed that the fire had been started and sustained with kerosene. Given the foregoing, the outcome of the trial would not have been different if the jury had not heard testimony that Sparks thought Wilson was a psychopath and that he was egotistical and her later statements that she loved Wilson, had hired a lawyer for him, and that she intended to marry him.

-11-

Alternatively, Wilson argues that he was denied the effective assistance of his counsel because his lawyer did not object to Sparks's alleged hearsay statements. Specifically, he contends that his lawyer should have objected to the prosecution's use of any of Sparks's statements that were not admissible as prior consistent statements under MRE 801(d)(1)(B) or by arguing that the statements should be excluded under MRE 403's balancing test. Wilson's argument, however, is premised upon his belief that the only statements admissible under MRE 806 were statements that qualified as a prior consistent statement under MRE 801(d)(1)(B). As explained above, however, the plain language of MRE 806 contemplates the use of prior inconsistent statements for impeachment purposes. Wilson's lawyer's performance was not deficient for failing to raise a meritless objection based upon a misunderstanding of the parameters of MRE 806. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) (stating that a defense lawyer is not ineffective for failing to raise a futile or meritless objection).

Wilson asserts that there cannot be a sound strategic reason for his lawyer to not object to the admission of Sparks's statements under MRE 403. We disagree. During his closing argument, Wilson's lawyer relied upon Sparks's numerous statements to argue that her preliminary examination testimony should not be believed. He argued:

> The only thing that they want you to believe puts him in the house is [Sparks.] [She's] the lynch pin. I don't deny that. Now, this is Sarah Sparks. You've seen her testify at the preliminary examination. You've seen her inter—at least one of her interviews. Not—not—not all of these interviews are recorded. So, we really don't know all of the conversation that happened out of the recorder's presence. Or the tape's presence of whatever you want to call it. But she changes her story every time it comes—comes convenient or inconvenient for her. She tells the police one story. Then she changes it again. And then she changes it again. And then you—and you hear testimony that—that [the defense lawyer] at the exam, the preliminary examination brought out from her that she sent something to Mr. Wilson saying something entirely different.

> And then, she testifies—she has this—this (indiscernible). Gets in contact with—with [the victim's] sister. And then, gets back in contact with him. And maintains contact. Hires a lawyer. Not me. Thank you. Uh, hires a lawyer for him. Put money in his account. Talking to him. Food he picks. She's all over the place. Is this a woman that you trust with a man's life? Do you trust her story at all? I'm not saying it because she's a woman. No. Don't get me wrong. I'm saying it because do you trust her? She's about as erratic as a hummingbird. She flits around to different flowers every time she gets a moment. She's all over the place.

Because admission of Sparks's numerous statements was clearly part of Wilson's lawyer's trial strategy, the failure to object under MRE 403 was not deficient performance. See *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (holding that declining to raise an objection can be sound trial strategy). "[T]his Court will not second-guess counsel regarding matters of trial strategy, and even if defense counsel was ultimately mistaken, this Court will not assess counsel's competence with the benefit of hindsight." *People v Rice (On Remand)*, 235 Mich App 429, 445;

597 NW2d 843 (1999). That a strategy does not work does not render its use ineffective assistance of counsel. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

## V. PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE

Wilson raises two additional arguments in a supplemental brief filed pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004). We address each in turn.

Wilson first contends that the prosecutor committed misconduct by failing to correct knowingly false testimony. "If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009) (quotation marks and citation omitted). The prosecution has an affirmative duty to correct false testimony. *People v Smith*, 498 Mich 466, 476; 870 NW2d 299 (2015). However, the burden is on the defendant to demonstrate that the witness's testimony was false. *People v Thurmond*, 348 Mich App 715, 736; 20 NW3d 311 (2023).

Here, Sparks's preliminary examination testimony was presented, as were her later statements recanting that testimony. There was, specifically, testimony that Sparks felt as if she had been threatened or coerced into making false statements against Wilson. Although Wilson maintains that her recantation testimony was truthful and her preliminary examination testimony was false, he only directs this Court to her conflicting statements. Further, even if additional statements from Sparks detailing the reasons why she allegedly lied during the preliminary examination were admitted, that is insufficient to establish that her preliminary examination testimony was, in fact, false. Accordingly, Wilson has not met his burden of demonstrating that the testimony presented by the prosecution was knowingly false.

Second, Wilson argues that his lawyer provided ineffective assistance by failing to move to admit Sparks's e-mail to the prosecution explaining the reasons why she had lied during the preliminary examination. Wilson contends that the e-mail was the best evidence of Sparks's reasons for recanting and should have been admitted under MRE 807. A defendant bears the burden of establishing the factual predicate for his or her claim of ineffective assistance. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). On appeal, Wilson directs this Court to a letter that Sparks wrote to him. In the letter, she stated:

> I'm writing this so you know about the video conference that I had with the prosecutor (arndt) and detective(knapp) before your trial. They told me if I went to trial and plead the 5th or didn't say what they needed me to, which was to say you were guilty, that they would charge me with conspiracy and I would get taken away from my kids and both their parents would be in prison for life. They said if I got on that stand and said anything along the lines that you were innocent or if I plead the 5th, that's what would happen to me. After that meeting I thought long and hard about what they said and purposely didn't make it to the airport on time so I didn't have to testify and risk getting thrown in jail when I had nothing to do with anything that took place. I finally got on the 3rd plane and came to court and the judge told me I couldn't testify and that I would have to stay the whole trial. I was so scared

of the threats or promises (whatever you want to call them) and I did what I could to make sure I didn't have to testify and get charged with anything. In the meeting I told them that I was going to plead the 5th on some questions because the final statement I wrote to them told them that you were innocent and they got really mad and the prosecutor (Mr arndt) said he promised that I would be charged as well and he would make it his mission to put me behind bars along with you. I didn't have an attorney, I had no legal advisor, nobody to ask questions I had, and no idea what I should do so I did the most logical thing I could think of, make sure I missed getting on the stand. I just have my two youngest children, one in March of 2018 and one in July of 2019 and my oldest in Feb of 2011 and I couldn't imagine being taken away from them for something I didn't have any part in. This was the first time I had to deal with anything like that and I was really scared and the whole situation from the beginning was world changing and life altering. I still have nightmares about the picture they showed me of the woman's body and about them throwing me in prison for a long time for telling them you were innocent. I hope me writing this helps you gain some clarity on why I didn't show up when I was supposed to. I'm sorry for whatever me not testifying has caused and I hope the courts now understand why I didn't arrive on time and why I missed multiple flights. Let me know if you need me to clarify anything else for you . . .

Love always,

Sara

The above letter was not available at the time of trial given that it had not yet been written. And, although it references threatening statements allegedly made by the prosecution and law enforcement that were made prior to trial, it references a video conference, not an e-mail exchange spanning from July 7, 2022, through August 18, 2022. At trial, Detective Knapp testified that the first e-mail indicating that Sparks was recanting her testimony was sent on July 8, 2022. He stated that he then set up an interview with her and that she had recanted her testimony in that interview as well. On cross examination, Wilson's lawyer questioned Detective Knapp about the recantation testimony, but did not seek to admit the e-mail with her statements.

Wilson has not provided this Court with a copy of the e-mail recanting her testimony. As such, we cannot properly evaluate whether Wilson's lawyer was ineffective for failing to seek admission of the letter as opposed to proceeding with simply asking Detective Knapp regarding the letter. Wilson, therefore, has not sustained his burden of establishing the factual predicate for this claim of ineffective assistance. *Id*.

Affirmed.

/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Adrienne N. Young